No. 99,130

IN THE MATTER OF A.J.S., A Minor Child.

(204 P.3d 543)

Opinion filed March 27, 2009.

*Angel R. Smith*, assistant attorney general, of Cherokee Nation, of Tahlequah, Oklahoma, and *Thomas C. McDowell*, of McDowell, Chtd., of Wichita, argued the cause and were on the briefs for appellants Cherokee Nation and natural father.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This dispute between the unmarried natural mother and natural father of A.J.S. requires us to revisit our state's adherence to the existing Indian family doctrine. The doctrine was first articulated in *In re Adoption of Baby Boy L.*, 231 Kan. 199, 643

P.2d 168 (1982), and since then has been invoked in Kansas and elsewhere to except certain custody proceedings involving children with Indian ancestry from the provisions of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 *et seq.* (2000).

Father—whose paternity has been confirmed since oral argument before this court, thus lifting a stay on issuance of this opinion—is an enrolled member of the Cherokee Nation. Mother consented to adoption of their child, A.J.S., by members of her family and sought to terminate Father's parental rights in state district court in Sedgwick County. The district judge rejected Father's effort to transfer this matter to tribal court and rejected the tribe's attempt to intervene, basing his decision on *Baby Boy L.* This is an interlocutory appeal from those rulings.

Mother had been dating Father approximately 1 month before she became pregnant with A.J.S. The day after the baby was born, Mother filed a petition to terminate Father's parental rights. She also signed a consent to the adoption of A.J.S. by members of her family. A temporary order placing A.J.S. in the custody of the intended adoptive parents was entered, and A.J.S. has resided with the intended adoptive parents since that order.

Father filed an Indian Heritage Affidavit, acknowledging that he was the father of A.J.S. and that he was an enrolled member of the Cherokee Nation. He invoked the placement preferences of the ICWA; requested that the tribal court assume jurisdiction; and requested that A.J.S. be placed with him, pending further proceedings. In his answer to Mother's petition, filed the same day, he denied allegations that he was unfit; suggested that Mother also was of Indian heritage; and requested the case be dismissed, stayed, or transferred to the tribal court pursuant to ICWA.

Mother objected to the transfer request, denied any Indian heritage, and sought placement for adoption with her own family. She also sought a declaration that ICWA was inapplicable under the existing Indian family doctrine of *Baby Boy L.*, 231 Kan. 199.

The Cherokee Nation filed a motion to intervene, arguing that ICWA applied. It also took issue with the sufficiency of its notice of the proceedings, an issue the tribe has now waived.

At the ensuing evidentiary hearing in district court, Mother testified that she was not a member of any tribe, that she had never lived on a reservation, and that she knew nothing of tribal customs. She also testified that Father never mentioned his ties to the Cherokee Nation and that she had never known he was a member of the tribe. According to Mother, Father never had contact with or provided any support for A.J.S. She also testified that she would revoke her consent to the adoption and raise A.J.S. by herself to prevent A.J.S. being raised by Father or the tribe. The evidence before the district judge also included printouts of information from Father's MySpace web page in which he had listed his heritage as white/Caucasian.

The parties stipulated that A.J.S. qualified as an Indian child under ICWA's definition. Nevertheless, the district judge ruled that ICWA was not applicable to this termination and adoption because A.J.S. had never been part of any Indian family relationship. Under these circumstances, the district judge also denied the Cherokee Nation's motion to intervene and declined to modify the temporary custody order. Trial was set to determine whether Father's parental rights should be severed, and permission was granted for this appeal.

Both parties suggest that this court should review the district judge's refusal to apply ICWA for abuse of discretion. We disagree. The threshold question of whether ICWA applies to this proceeding raises a question of statutory interpretation or construction, *i.e.*, a question of law over which this court exercises unlimited review. See *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008). Likewise, the related question of whether the common-law precedent set by *Baby Boy L.*, 231 Kan. 199, should stand also is a question of law for this court.

These proceedings were initiated under provisions of the Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 *et seq.*, governing relinquishment and adoption and the associated termination of the rights of natural parents. See K.S.A. 59-2136. As Father and the tribe point out, however, federal law preempts nonconforming or conflicting state law. United States Constitution, Art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516-17, 120 L. Ed.

2d 407, 112 S. Ct. 2608 (1992). Any state sovereignty-based presumption against federal preemption is overcome by showing a Congressional intent to preempt. See, *e.g.*, *Medtronic v. Lohr*, 518 U.S. 470, 485, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996). By its terms, ICWA applies to any child custody proceeding, including a termination of parental rights proceeding and a foster care or adoptive placement proceeding, involving an Indian child. 25 U.S.C. § 1903(1)(i), (ii) (2000).

There is no dispute that A.J.S. is an Indian child within the meaning of ICWA, see 25 U.S.C. § 1903(4), or that this is a state court child custody proceeding, see 25 U.S.C. § 1903(1)(ii), (iv). Generally, when such a child is not domiciled or residing on a reservation and the child's father objects to severance of his rights and the child's adoption, the tribe is permitted to intervene in the proceeding. 25 U.S.C. § 1911(c); see, *e.g.*, *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989). Moreover, ICWA's procedural and substantive provisions govern the case to avoid a risk of invalidation of its result. See, *e.g.*, 25 U.S.C. § 1912 (2000) (notice); 25 U.S.C. § 1914 (2000) (invalidation); 25 U.S.C. § 1915 (2000) (placement preferences).

The parties appreciate that, to this point, Kansas has departed from the ICWA norm through the existing Indian family doctrine, adopted unanimously by this court in *Baby Boy L.*, 231 Kan. 199. Since *Baby Boy L.* was decided in 1982, 4 years after enactment of ICWA, the doctrine has been consistently applied in Kansas. See *In re Adoption of B.G.J.*, 281 Kan. 552, 133 P.3d 1 (2006) (declining to accept appellant's invitation to reject existing Indian family doctrine; doctrine not implicated in appeal); *In re M.B.*, 39 Kan. App. 2d 31, 176 P.3d 977 (2008) (holding existing Indian family doctrine precludes application of ICWA when Indian child's parents have not maintained significant social, cultural, political relationship with tribe); *In re J.J.G.*, 32 Kan. App. 2d 448, 83 P.3d 1264 (2004) (discussing existing Indian family doctrine). Thus the parties' principal arguments focus on the logic and wisdom of the doctrine and the similarity or lack of similarity between the facts of this case and those before this court in *Baby Boy L.*

Baby Boy L. was born to an unmarried, non-Indian woman, who gave consent for adoption by non-Indian appellees. The district judge granted temporary custody to the appellees, who later filed a petition for termination of the parental rights of Baby Boy L.'s natural father, C.P. C.P., who was incarcerated, contested the petition and sought denial of the adoption. The district court judge bifurcated the proceedings, dealing first with the termination action and then the adoption. The parties presented their evidence, and, before ruling, the judge learned that C.P. was an enrolled member of the Kiowa Tribe. The tribe was then notified. It sought intervention, invoked ICWA, requested that the proceeding be transferred to tribal court, and demanded Baby Boy L. be placed with C.P.'s parents and/or the tribe.

The district judge ruled that ICWA did not apply and he denied the tribe's motion to intervene. The judge reasoned that ICWA was designed to prevent the unilateral break-up of Indian families. Baby Boy L. had never been, and, in the judge's view, absent his mother's consent, would never be part of an Indian family. The district judge terminated C.P.'s parental rights and granted the adoption.

C.P., his parents, and the Kiowa Tribe appealed, arguing that ICWA applied and that the tribe had a right to intervene and to petition the court for a change of jurisdiction and custody of Baby Boy L.

On appeal, this court focused on the language, history, and purpose of ICWA in order to determine whether Congress intended it to be applicable on these facts. The court concluded "that the ICWA, by its own terms, does not apply to these proceedings." *Baby Boy L.*, 231 Kan. at 207. Justice Richard W. Holmes wrote for the court:

"A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother. Section 1902

of the Act makes it clear that it is the declared policy of Congress that the Act is to adopt minimum federal standards 'for the removal of Indian children from their [Indian] families.' Numerous provisions of the Act support our conclusion that it was never the intent of Congress that the Act would apply to a factual situation such as is before the court." *Baby Boy L.*, 231 Kan. at 205-06.

The court noted that its position was not without criticism, from appellants as well as commentators, but suggested that, even if it had concluded ICWA applied, there would be no reversible error in Baby Boy L.'s situation because his mother's consent to adoption was contingent on the appellees' identity. She had made it clear that

"if this adoption was denied for any reason, or if an attempt was made to place the child for adoption under the terms of the Act, she would revoke her consent and again take custody of her child, and never consent to his placement with his father or with the father's extended Indian family, the Kiowa Tribe, the grandparents or anyone else." *Baby Boy L.*, 231 Kan. at 208.

This meant, the court said, that Baby Boy L. would be placed with a non-Indian family under either ICWA or Kansas law. *Baby Boy L.*, 231 Kan. at 209.

Given its ruling on the inapplicability of ICWA, the court also saw no error in denial of the Kiowa Tribe's motion to intervene. *Baby Boy L.*, 231 Kan. at 209.

The validity of the existing Indian family doctrine has been called into repeated question by a variety of courts and commentators over the course of the 27 years since *Baby Boy L.* was decided. See, *e.g., In re Baby Boy C. Jeffrey A.*, 27 App. Div. 3d 34, 46-47, 805 N.Y.S.2d 313 (2005); Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 Emory L.J. 587, 624-34 (2002); Prim, *The Indian Child Welfare Act and the Existing Indian Family Exception: Re-routing the Trail of Tears?*, 24 Law & Psychol. Rev. 115, 118-19 (2000).

Although the United States Supreme Court has not addressed the issue before us and has consistently denied review of cases dealing with the constitutionality of ICWA, its 1989 decision in *Mississippi Band of Choctaw Indians v. Holyfield*, underscored the central importance of the relationship between an Indian child and

his or her tribe, independent of any parental relationship. *Holyfield*, 490 U.S. at 50.

In *Holyfield*, the Court vacated an adoption decree entered under state law, holding that ICWA should have been applied to the proceedings when both unmarried parents were Indian, were domiciled on a reservation, and the mother had left the reservation to give birth to twins. The couple consented to the twins' adoption under state law, and the adoption decree was final within a month of the twins' birth. *Holyfield*, 490 U.S. at 37-38.

The tribe sought to invalidate the adoption, and, although the twins had been living with their adoptive parents for 3 years, the Supreme Court agreed that the proceedings were invalid, that ICWA should have governed, and that the tribe had the right to be involved in the proceeding. Although focused on whether "domicile" should be defined by state law or by ICWA for purposes of determining jurisdiction, rather than on the existing Indian family doctrine, it is significant that the Court relied extensively on testimony from Congressional hearings leading to the passage of ICWA and on ICWA's explicit statement of Congress' purpose:

"The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. Senate oversight hearings in 1974 yielded numerous examples, statistical data, and expert testimony documenting what one witness called '[t]he wholesale removal of Indian children from their homes, . . . the most tragic aspect of Indian life today.' Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Blyer) (hereinafter 1974 Hearings). Studies undertaken by the Association on American Indian Affairs in 1969 and 1974, and presented in the Senate hearings, showed that 25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions. *Id.*, at 15; see also H.R.Rep. No. 95-1386, p. 9 (1978) (hereinafter House Report), U.S. Code Cong. & Admin.News 1978, pp. 7530, 7531. Adoptive placements counted significantly in this total: in the State of Minnesota, for example, one in eight Indian children under the age of 18 was in an adoptive home, and during the year 1971-1972 nearly one in every four infants under one year of age was placed for adoption. The adoption rate of Indian children was eight times that of non-Indian children. Approximately 90%

of the Indian placements were in non-Indian homes. 1974 Hearings, at 75-83. A number of witnesses also testified to the serious adjustment problems encountered by such children during adolescence, as well as the impact of the adoptions on Indian parents and the tribes themselves. See generally 1974 Hearings.

. . . .

"Further hearings, covering much the same ground, were held during 1977 and 1978 on the bill that became the ICWA. While much of the testimony again focused on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves of the massive removal of their children. For example, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association, testified as follows:

" 'Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.' 1978 Hearings, at 193.

". . . . Chief Isaac also summarized succinctly what numerous witnesses saw as the principal reason for the high rates of removal of Indian children:

" 'One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worse contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.' *Id.*, at 191-92.

"The congressional findings that were incorporated into the ICWA reflect these sentiments. The Congress found:

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . .;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

. . . .

"The ICWA thus, in the words of the House Report accompanying it, 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' House Report, at 23, U.S. Code Cong. & Admin.News 1978, at 7546. It does so by establishing 'a federal policy that, where possible, an Indian child should remain in the Indian community,' and by making sure that Indian child welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' *Id.* at 24, U.S. Code Cong. & Admin. News 1978 at 7546." *Holyfield*, 490 U.S. at 32-37.

The Court's result and rationale in *Holyfield* recognized that ICWA grew in part out of concern for preservation of tribal interests in Indian children and that those interests could not necessarily be defeated by the desires of parents or concerns over placement permanency.

The majority of our sister states that have considered the existing Indian family doctrine have rejected it. See *In the Matter of the Adoption of T.N.F.*, 781 P.2d 973 (Alaska 1989); *Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 7 P.3d 960 (Ariz. App. 2000); *In re N.B.*, 2007 WL 2493906 (Colo. App. 2007) (unpublished opinion); *In re Baby Boy Doe*, 123 Idaho 464, 849 P.2d 925 (1993); *In re Adoption of S.S.*, 252 Ill. App. 3d 33, 42-43, 622 N.E.2d 832 (1993), *rev'd on other grounds* 167 Ill.2d 250, 657 N.E.2d 935 (1995); *In re Elliot*, 218 Mich. App. 196, 203, 554 N.W.2d 32 (1996); *In the Matter of the Adoption of Riffle*, 277 Mont. 388, 922 P.2d 510 (1996); *Matter of Adoption of a Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925 (1988); see also Kunesh, *Borders Beyond Borders—Protecting Essential Tribal Relations Off Reservation Under the Indian Child Welfare Act*, 42 New Eng. L. Rev. 15, 59 n.226, 227 (2007); *In re Baby Boy C.*, 27 App. Div. 3d 34, 805 N.Y.S.2d 313 (2005); *In re A.B.*, 663 N.W.2d 625 (N.D. 2003); *Quinn v. Walters*, 117 Or. App. 579, 583-84, 845 P.2d 206 (1993), *rev'd on other grounds* 320 Or. 233, 881 P.2d 795 (1994); *State in Interest of D.A.C.*, 933 P.2d 993 (Utah App. 1997).

Other states, having once adopted the doctrine, have now abandoned it. See *In the Matter of Baby Boy L.*, 103 P.3d 1099 (Okla. 2004) (holding the existing Indian family exception to application of Indian Child Welfare Act no longer viable, overruling prior state cases). Such changes of heart can be traced to changes in state law.

See Wash. Rev. Code § 26.10.034(1) (2004); Wash. Rev. Code § 26.33.040(1) (2004); *Adoption of Crews*, 118 Wash. 2d 561, 825 P.2d 305 (1992); *In re R.E.K.F.*, 698 N.W.2d 147, 151 (Iowa 2005); Okla. Stat. tit. 10, § 40.3 (2001). In South Dakota, the court merely recognized that the existing Indian family doctrine was inconsistent with ICWA's motivating impulse and the United States Supreme Court's decision in *Holyfield*. See *Matter of Adoption of Baade*, 462 N.W.2d 485, 489-90 (S.D. 1990).

California's courts are split on the viability of the existing Indian family doctrine. Compare *In re Vincent M.*, 150 Cal. App. 4th 1247, 1265, 59 Cal. Rptr. 3d 321 (2007) (rejecting existing Indian family doctrine based on California statutory amendment); *In re Bridget R.*, 41 Cal. App. 4th 1483, 49 Cal. Rptr. 2d 507 (1996) (upholding validity of doctrine on constitutional ground); *Crystal R. v. Superior Court*, 59 Cal. App. 4th 703, 69 Cal. Rptr. 2d 414 (1997) (accepting, applying doctrine).

The doctrine has been employed by a few of our sister states on facts such as those before us; rationales have included perceived Congressional intent and avoidance of constitutional infirmities in ICWA's placement preferences. See *In the Matter of Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Rye v. Weasel*, 934 S.W.2d 257 (Ky. 1996); *Hampton v. J.A.L.*, 658 So. 2d 331 (La. App. 1995); *C.E.H. v. L.M.W.*, 837 S.W.2d 947, 952 (Mo. App. 1992); *In Interest of S.A.M.*, 703 S.W.2d 603 (Mo. App. 1986); see also *S.A. v. E.J.P.*, 571 So. 2d. 1187 (Ala. Civ. App. 1990). Alabama has specifically limited application of the doctrine to facts similar to those here and in *Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006) (doctrine applies only if child illegitimate, never member of Indian family or culture, non-Indian mother relinquishing child voluntarily).

We also note that there have been numerous amendments to and attempts to amend ICWA since its original enactment. On occasion, unsuccessful efforts have addressed the existing Indian family doctrine, but these efforts have been conflicting, directed at overruling it and endorsing it. Compare S. 1976, 100th Cong. (1987), and H.R. 3275, 104th Cong. (1996).

From this point in ICWA interpretation and the development of common law, we are persuaded that abandonment of the existing Indian family doctrine is the wisest future course. Although we do not lightly overrule precedent, neither are we inextricably bound by it. See *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004). *Baby Boy L.* is ready to be retired.

First, the existing family doctrine appears to be at odds with the clear language of ICWA, which makes no exception for children such as A.J.S. See 25 U.S.C. § 1903(4); Jaffke, *The "Existing Indian Family" Exception to the Indian Child Welfare Act: The States' Attempt to Slaughter Tribal Interests in Indian Children*, 66 La. L. Rev. 733, 745-51 (2006).

Further, as recognized by the *Holyfield* decision, 430 U.S. at 36-37, tribal interests in preservation of their most precious resource, their children, drove passage of ICWA; and its expressly declared policy is

"to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 U.S.C. § 1902.

As counsel for the Cherokee Nation emphasized at oral argument before us, a child removed now from the tribe cannot later be a voice for the tribe.

We also detect illogic in the *Baby Boy L.* opinion's secondary justification for its result, also invoked by the district judge here, that the non-Indian mother's refusal to consent to adoption of her infant by anyone other than the proposed non-Indian adoptive parents inevitably means a non-Indian upbringing for the child. In *Baby Boy L.*, as here, the mother's testimony was evidence of her intention only. That intention extends only as far as the mother's unilateral control. If ICWA applies, a father's fitness to parent and the child's placement will not be governed solely by the mother's expressed desires. The father and the tribe also will be heard, and ICWA's preferences will apply in the absence of "good cause to the contrary." 25 U.S.C. § 1915(a). Although the result reached

may be the same as that dictated by the existing Indian family doctrine, it may not be. See *Baby Boy C.*, 27 App. Div. 3d at 52-53; *In re Alicia S.*, 65 Cal. App. 4th 79, 88-89, 76 Cal. Rptr. 2d 121 (1998). A.J.S.'s unmarried mother's status as a non-Indian or another factor or set of factors may militate in favor of or against a certain ICWA preference or constitute "good cause" to ignore all of the preferences. We cannot know and neither could the members of this court who decided *Baby Boy L.* Simply put, an Indian family may yet be recognized or created if ICWA is not avoided through the existing Indian family doctrine.

We are also influenced by our sister states' and commentators' widespread and well-reasoned criticism of the doctrine. For example, in *Baby Boy C.*, 27 App. Div. 3d 34, in which an unmarried Indian mother and non-Indian father attempted to relinquish their parental rights to facilitate their infant's adoption by non-Indian parents, the court convincingly detailed inconsistencies between the existing Indian family doctrine and the plain language of ICWA, as well as the doctrine's deviation from ICWA's core purpose of "preserving and protecting the interests of Indian tribes in their children." 27 App. Div. 3d at 47. The court said:

"Because Congress has clearly delineated the nature of the relationship between an Indian child and tribe necessary to trigger application of the Act, judicial insertion of an additional criterion for applicability is plainly beyond the intent of Congress and must be rejected. . . .

"Another problem with the [doctrine] is that its acceptance would undermine the significant tribal interests recognized by the Supreme Court in *Holyfield*. The Supreme Court made it clear in *Holyfield* that Indian tribes have an interest in applying ICWA that is distinct from that of the child's parents, and that such parents may not unilaterally defeat its application by deliberately avoiding any contact with the tribe or reservation (490 U.S. at 51-52). In many respects, that is what occurred in this case. By divorcing herself from tribal life and by putting her child up for adoption away from the reservation immediately after birth, [the mother] singlehandedly destroyed the notion of an 'existing Indian family.' If the [doctrine] were applied in this instance, [the mother] would have succeeded in nullifying ICWA's purpose at the expense of the interests of the Tribe. However, as *Holyfield* recognized, Congress intended otherwise by specifically mandating that tribal interests be considered ['protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents']; see also *Matter*

*of Baby Boy Doe,* 123 Idaho [464, 470-71, 849 P.2d 925, 931-32 (1993)]; *In re A.B.,* 663 N.W.2d [665, 636 (N.D. 2003)].

"Nor can we agree . . . that 'relinquishing control over a child born to parents uninvolved in Indian life costs the tribe nothing.' [Citation omitted.] Where, as here, [the mother] has rejected Indian life and culture and then, voluntarily relinquished her newborn Indian child to be adopted by a non-Indian couple, the detriment to the Tribe is quite significant—the loss of two generations of Indian children instead of just one.

"The [doctrine] also conflicts with the Congressional policy underlying ICWA that certain child custody determinations be made in accordance with Indian cultural or community standards (see *Holyfield,* 490 U.S. at 34-35 [one of the most serious failings of the present system is that Indian children are removed from natural parents by nontribal governmental authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and child rearing]; 25 U.S.C. § 1915[d] [applicable standards 'shall be the prevailing social and cultural standards of the Indian community']).

"The [doctrine] is clearly at odds with this policy because it requires state subjective factual determination as to the 'Indianness' of a particular Indian child or parent, a determination that state courts 'are ill-equipped to make' (*In re Alicia S.,* 65 Cal. App. 4th at 90, 76 Cal. Rptr. 2d at 128). Since ICWA was passed, in part, to curtail state authorities from making child custody determinations based on misconceptions of Indian family life, the [doctrine], which necessitates such an inquiry, clearly frustrates this purpose (*Holyfield* [,490 U.S. at 34-35]; *Quinn,* [*v. Walters,* 117 Or. App. 579, 584 n.2, 845 P.2d 206 (1993)]; [*State in Interest of D.A.C.,* 933 P.2d 993, 999 (Utah App. 1997)])." *Baby Boy C.,* 27 App. Div. 3d at 48-49.

See also Jaffke, 66 La. L. Rev. at 745-58; Atwood, 51 Emory L.J. at 625-42; Prim, 24 Law & Psychol. Rev. at 118-24; Graham, *"The Past Never Vanishes": A Contextual Critique of the Existing Indian Family Doctrine,* 23 Am. Indian. L. Rev. 1, 34-43 (1998); Cross, *The Existing Indian Family Exception: Is it Appropriate to Use a Judicially Created Exception to Render the Indian Child Welfare Act of 1978 Inapplicable?* 26 Cap. U. L. Rev. 847, 864-90 (1998); Parnell, *The Existing Indian Family Exception: Denying Tribal Rights Protected by the Indian Child Welfare Act,* 34 San Diego L. Rev. 381, 397-401, 408-28 (1997); Davis, *The Existing Indian Family Exception to the Indian Child Welfare Act,* 69 N.D. L. Rev. 465, 475-96 (1993); Lehmann, *The Indian Child Welfare Act of 1978: Does it Apply to the Adoption of an Illegitimate Child?* 38 Cath. U. L. Rev. 511, 533-37 (1989).

Given all of the foregoing, we hereby overrule *Baby Boy L.*, 231 Kan. 199, and abandon its existing Indian family doctrine. Indian heritage and the treatment of it has a unique history in United States law. A.J.S. has both Indian and non-Indian heritage, and courts are right to resist essentializing any ethnic or racial group. However, ICWA's overall design, including its "good cause" threshold in 25 U.S.C. § 1915, ensures that all interests—those of both natural parents, the tribe, the child, and the prospective adoptive parents—are appropriately considered and safeguarded. ICWA applies to this state court child custody proceeding involving A.J.S., and the Cherokee Nation must be permitted to intervene. The contrary rulings of the district judge are reversed, and the case remanded for further proceedings consistent with this opinion.

Reversed and remanded.