NOT DESIGNATED FOR PUBLICATION

No. 122,121

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of N.O., J.O.,
A.O., Z.O., and C.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Opinion filed April 24, 2020. Affirmed.

*John Paul D. Washburn*, of Topeka, for appellant.

*Morgan L. Hall*, deputy district attorney, for appellee.

Before GREEN, P.J., POWELL and SCHROEDER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights (TPR) to N.O., J.O., A.O., Z.O., and C.C. On appeal, Mother argues that the district court erred by terminating her parental rights for the following reasons: (1) because the district court could not terminate her parental rights over C.C. without also terminating Father's parental rights; (2) because the court-appointed guardian ad litem (GAL) did not comply with Kansas Supreme Court Rule 110A(c) (2019 Kan. S. Ct. R. 184); (3) because clear and convincing evidence did not support that she was unfit and unlikely to change her unfitness in the foreseeable future; and (4) because the district court ignored certain evidence when finding that it was in the children's best interests to terminate her parental rights. Because we reject Mother's arguments, we affirm the district court's termination of Mother's parental rights.

1

Mother's Children in Need of Care (CINC) cases were pending before the district court for nearly seven years. But Mother has not included many of the permanency hearing and review hearing journal entries in the record on appeal. Nor has mother included transcripts from those hearings in the record on appeal. The only hearing transcript Mother includes in the record on appeal is the TPR trial. Even then, Mother has not included the exhibits admitted at the trial in the record on appeal. Thus, the factual statement here has been assembled from an incomplete record on appeal.

On September 21, 2012, the State petitioned the district court to find N.O., age 10, J.O., age 9, A.O, age 6, Z.O., age 4, and C.C., age 1, CINC. The State alleged that Mother physically neglected the children. Moreover, the State alleged that Mother tested positive for methamphetamine use. The State noted that the district court had twice previously adjudicated the children CINC because of Mother's drug use, involving two of the children testing positive for methamphetamine at birth.

Originally, the children remained in Mother's custody under an Order of Informal Supervision (OIS). Nevertheless, on August 19, 2013, the State moved to remove the children from Mother's custody for the following reasons: Mother had not successfully completed the OIS; Mother had not enrolled the children in school; and the children's current whereabouts were unknown.

About a month later, the district court temporarily removed the children from Mother's custody. In doing so, the district court found that Mother's substance abuse, potential mental illness, and previous decision to "flee the jurisdiction [with] the children" necessitated the emergency removal of the children. The district court therefore placed the children in the custody of the Department of Children and Families (DCF). Approximately a month later, the district court ordered the children to be placed with Mother while remaining in DCF custody.

The children remained with Mother until April 10, 2014. On that date, DCF removed the children from Mother's physical care because Mother caused "a life threatening risk" to C.C. and had seemingly "relapsed in the illegal use of drugs." Based on this information, the district court ordered an emergency change of placement. Of note, although DCF maintained custody of the children, it contracted with the Kaw Valley Center (KVC) to provide the children and Mother case management services.

Next, on June 24, 2014, the district court found that there was clear and convincing evidence that the children were CINC because of the following: (1) Mother had failed to provide the children adequate parental care, (2) Mother had failed to provide the children the care necessary to sustain their physical, mental, or emotional health, and (3) Mother had either neglected the children or physically, mentally, emotionally, or sexually abused the children. Despite Mother's current problems, the district court found that family reintegration was the goal in all of the children's CINC cases. The district court then ordered that the children remain with DCF.

Nearly two years later, on June 13, 2016, the district court granted Mother's motion to place the children with her while remaining in DCF custody. According to the district court's notes, the State did not oppose this motion because it recognized that the children's initial "removal [from Mother's placement] was not in compliance with [K.S.A.] 38-2259." The district court, however, explicitly ordered (1) that the children's CINC case remain open and (2) that the children remain in DCF custody. So, only the children's placement changed.

The KVC, however, started having concerns about the children's placement with Mother shortly afterwards. Mother had no employment. Mother did not keep consistent contact with the KVC. And Mother did not have stable housing: She moved from her mother's house, to a friend's house, and to a hotel. There were reports that Mother and the children were living out of Mother's minivan. The children also continued to have

3

behavioral and school attendance problems. N.O. was admitted into a local hospital's behavioral health center for treatment because of mental health issues and his "run [away] behaviors." Moreover, in November 2016, Mother tested positive for methamphetamine use.

A short time later, the State moved to change the children's placement and to set the hearing immediately for December 22, 2016. The State argued that the preceding problems created an emergency requiring removal of the children from Mother's placement. The district court agreed, removing the children from Mother's placement on the same day as the State's emergency removal motion. Despite the emergency removal, the district court still found that family reintegration was the goal. It then returned the children to DCF placement.

Meanwhile, the KVC continued to provide case management services to the family. Although many case managers were assigned to the children's CINC cases over the years, it seems that Mother's case plan tasks remained the same following the children's removal from her placement in December 2016. Those case plan tasks were as follows:

- Mother must obtain safe and stable housing;
- Mother must obtain a legal source of income;
- Mother must complete a mental health evaluation;
- Mother must provide documentation of family therapy attendance;
- Mother must not use illegal drugs;
- Mother must submit to random drug testing;
- Mother must provide documentation of her Narcotics Anonymous attendance;
- Mother must complete drug treatment;

- Mother must maintain contact with the KVC; and
- Mother must follow all of the KVC's other recommendations.

Yet, about eight and a half months later, on September 6, 2017, the State moved to terminate Mother's parental rights to all the children. The State alleged that Mother was unfit because she had not complied with any of her case plan tasks. And at the next review hearing, the district court found that family reintegration may no longer be a viable goal.

After multiple continuances, in late May 2019, the district court held a trial on whether to terminate Mother's parental rights to all of the children. At the trial, Mother and her attorney, the children's GAL, and the State were present. C.C.'s Father was also present. Although N.O., J.O., A.O., and Z.O.'s Father's parental rights had been previously terminated, C.C.'s Father's parental rights remained intact. But the State sought to terminate C.C.'s Father's parental rights as well. Thus, the TPR trial involved whether to terminate Mother's parental rights and whether to terminate C.C.'s Father's parental rights.

Moreover, although N.O., then 16 years old, A.O., then 13 years old, Z.O., then 11 years old, and C.C., then 8 years old, never attended the trial; J.O., then 15 years old, and his court-appointed attorney attended the first 3 days of trial. J.O.'s court-appointed attorney attended the fourth and final day of trial, but J.O. did not. The district court found it was not in J.O.'s best interests to attend the final day of trial because he had mental health issues following the third day of trial.

During the trial, the State presented the testimony of many KVC employees who had worked on the children's CINC cases. The only evidence Mother presented on her behalf was her own testimony.

5

Highly summarized, the KVC workers testified that Mother had not complied with a single case plan task. Regarding her drug use, one worker explained that during 2018, Mother submitted 11 drug tests, of which 3 were positive for methamphetamine use. From January 2019 to April 8, 2019, Mother was supposed to submit to 22 drug tests. But she did not appear for testing 19 times. For the three times Mother appeared for testing, she tested positive for methamphetamine use twice.

As for her other case plan tasks, the KVC workers testified that Mother had inadequate housing. They testified that Mother never had full-time employment. Moreover, they testified that Mother often missed her supervised visitation appointments with the children. And KVC workers reported that when she attended her supervised visitation appointments, she could be very aggressive with the workers. One worker testified that Mother told him that she was going to "burn[] down the KVC building, and piss[] on [the workers'] ashes."

In addition to the preceding, the workers testified about the children's ongoing special needs. Z.O. was doing the best in his placement. But the remaining children had multiple problems. Although C.C. was doing well in her current placement, she had bouts of verbal and physical aggression if asked to do something she did not want to do. A.O. had previously been committed to psychiatric residential treatment facilities. He suffered from attention deficit hyperactivity disorder, unspecified mood disorder, rapid attention disorder, and oppositional defiance disorder. Moreover, A.O.'s special needs made him difficult to place as he could become verbally and physically aggressive. Both N.O. and J.O. were verbally and physically aggressive. N.O. often expressed a desire to hurt others, and sometimes N.O. got in physical fights. N.O. also suffered from attention deficit hyperactivity disorder, unspecified mood disorder, oppositional defiance disorder, and depression.

Both J.O. and N.O. were also prone to running away from their placement. Although N.O. was currently in his foster placement, he was on the run during the majority of his CINC case. Additionally, during one of Mother's supervised visitations, J.O. ran away after learning Mother had failed her drug test.

As for Mother, during her trial testimony, Mother admitted that she had not complied with her case plan tasks. Even so, she testified that she was working to become fit as a parent. She explained that her current plan was to gain admission to inpatient drug treatment. She alleged that she hoped to get an emergency admission for detox to a local drug treatment facility. She explained that there was a possibility that her emergency detox could turn into inpatient treatment.

Next, Mother admitted that she had not had full-time employment since 2012. She explained that she did not have a job when her children lived with her because she had lived off of the children's child support and disability payments: "[My] source of income was depleted when the kids weren't with [me]." She asserted that it was difficult for her to obtain employment because of her children's appointments, her depression, and her lack of transportation. She testified that she soon hoped to obtain a legal source of income by applying for disability. Mother asserted that her depression and a heart condition may qualify her for disability payments. She also asserted that she would try to obtain employment after completing drug treatment, at which time she hoped she could also afford stable housing.

When confronted during cross-examination, Mother recognized that completing drug treatment was one of her case plan tasks. Mother also recognized that obtaining a mental health evaluation was one of her case plan tasks. But Mother testified that she avoided mental health treatment because she knew a doctor would want to "medicate[]" her." She explained that she did not "like to be medicated" because she was "unable to function" and "parent normally." At the same time, however, Mother admitted her

7

ongoing methamphetamine addiction went "hand in hand" with her ongoing mental health issues.

When the trial concluded, the district court took the parties' arguments under advisement. Later, the district court issued an order terminating Mother's parental rights to all of her children. The district court found that clear and convincing evidence supported Mother's current and future unfitness under several K.S.A. 2019 Supp. 38-2269(b) factors. Then, the district court found that termination of Mother's rights was in the best interests of the children's physical, mental, and emotional health. The district court did not, however, terminate C.C.'s Father's parental rights; it found termination unnecessary because C.C.'s Father was willing to become fit in the foreseeable future.

Mother timely appealed the termination of her parental rights.

*Did the District Court Err by Terminating Mother's Parental Rights?*

On appeal, Mother makes four arguments why we must reverse the termination of her parental rights. First, she argues that the district court could not terminate her rights to C.C. because it did not terminate C.C's Father's parental rights. Second, she argues that the GAL did not comply with Kansas Supreme Court Rule 110A(c). Third, she argues that evidence did not support the district court's finding that she was unfit and unlikely to become fit in the foreseeable future. Fourth, she argues that the district court ignored certain evidence establishing that termination of her parental rights was not in her children's best interests.

The State responds that each of Mother's arguments are meritless.

*Standard of Review*

When considering a district court's decision to terminate parental rights, we must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). While engaging in this review, we do not reweigh conflicting evidence, reweigh credibility determinations, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Moreover, to the extent Mother's arguments involve statutory interpretation, statutory interpretation involves a question of law over which we have unlimited review. *In re A.J.S.*, 288 Kan. 429, Syl. ¶ 1, 204 P.3d 543 (2009).

*Termination of Mother's Rights Alone*

Mother's first argument is that the district court could not terminate her parental rights over C.C. without terminating Father's parental rights over C.C. In making this argument, Mother relies on K.S.A. 2019 Supp. 38-2268(b)(5). K.S.A. 2019 Supp. 38-2268(b)(5) provides that when a parent relinquishes his or her rights over a child under "a belief that the child's other parent would relinquish the child to the secretary or would be found unfit, and this does not occur, the rights of the parent who has relinquished a child to the secretary shall not be terminated." According to Mother, the "same outcome" under K.S.A. 2019 Supp. 38-2268(b)(5) should occur when a district court involuntarily terminates just one parent's parental rights.

Nevertheless, this argument clearly ignores the plain language of K.S.A. 2019 Supp. 38-2268(b)(5), which explicitly states that it applies to relinquishment cases. The most fundamental rule of statutory construction is that the Legislature's intent controls how we interpret a statute. And if at all possible, we must determine the Legislature's

9

intent from the plain language of a statute. *In re Adoption of B.B.M.*, 290 Kan. 236, 240, 224 P.3d 1168 (2010). As a result, when interpreting a statute's meaning, we do not add language into a statute that is not readily found within it. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

Mother here seeks to change the meaning of K.S.A. 2019 Supp. 38-2268(b)(5). The plain language of that statute involves only relinquishment cases. Under K.S.A. 2019 Supp. 38-2268(b)(5)'s plain language, our Legislature allows a parent to avoid termination of his or her parental rights when that parent relinquished his or her rights to a child under a mistaken belief that the other parent would also relinquish his or her rights. Nothing under K.S.A. 2019 Supp. 38-2268(b)(5) speaks to situations when the State seeks to involuntarily terminate a parent's rights. But this case involves an involuntary termination. Moreover, nothing under the plain language of K.S.A. 2019 Supp. 38-2269—the statute concerning termination of parental rights—prohibits termination of just one parent's rights.

In addition, Mother recognizes that K.S.A. 2019 Supp. 38-2264(k) implicitly addresses situations where a court terminates just one parent's rights to a child. Even so, outside of pointing to K.S.A. 2019 Supp. 38-2268(b)(5)'s plain language, Mother cites no authority to support her interpretation. It is a well-known rule that an appellant does not adequately brief an argument if the appellant fails to support the argument with authority or fails to explain why the argument is sound despite the lack of supporting authority. Moreover, failure to adequately brief an issue is akin to abandonment. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Thus, Mother's argument fails not only because it disregards K.S.A. 2019 Supp. 38-2268(b)(5)'s plain language but also because it is entirely unsupported by authority.

*Supreme Court Rule 110A(c) Compliance*

Next, Mother complains that the GAL violated Rule 110A(c) by not explaining why N.O., A.O., and Z.O. were not present at her TPR trial. Mother also complains that the GAL violated Rule 110A(c) by not explaining to the district court whether A.O., Z.O., and C.C. wanted her parental rights terminated. Mother contends that because the district court did not address the GAL's failings under Rule 110A(c), we must reverse the termination of her parental rights.

Yet, there are multiple problems with Mother's arguments. To begin with, Mother did not raise this argument before the district court. Generally, issues not raised below cannot be raised for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). Although there are exceptions to this rule, for an exception to apply an appellant must plead an exception. Here, however, Mother never recognizes that she is raising her argument for the first time on appeal. So, no exception applies.

Furthermore, Mother's failure to explain why we should consider her argument for the first time on appeal violates Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34). Rule 6.02(a)(5) requires appellants to explain why an issue that was not raised below should be considered for the first time on appeal. Our Supreme Court has held that when appellants violate Rule 6.02(a)(5), Kansas appellate courts will deem the argument waived and abandoned. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). Thus, Mother's failure to comply with Rule 6.02(a)(5) means she has abandoned her argument.

Next, notwithstanding the preceding problems, nothing in the record on appeal indicates that the GAL violated Rule 110A(c). In particular, Rule 110A(c) requires a GAL to do the following when representing a child:  (1) to conduct an independent

11

investigation of the case; (2) to determine the best interests of the child; (3) to adequately represent the child in court; (4) to explain court proceedings to the child; (5) to make recommendations regarding services; and (6) to monitor the implementation of service plans and court orders.

Yet, nothing under Rule 110A(c) requires the GAL to explain why certain children are not in attendance at a parent's TPR trial. And although K.S.A. 2019 Supp. 38-2262 allows children age 10 and older to address the court on termination, K.S.A. 2019 Supp. 38-2262 does not require the GAL to explain why a child chose not to attend a hearing or address the court. As a result, nothing supports Mother's argument that the GAL violated Rule 110A(c) by not explaining why N.O., A.O., and Z.O. were not present during her TPR trial.

Additionally, Mother's argument that the GAL failed to tell the district court whether A.O., Z.O., and C.C. wanted her rights terminated ignores the GAL's closing arguments. Rule 110A(c)(3)(C) states that a GAL must present "the child's position." In her closing arguments to the district court, the GAL explained that N.O. and J.O. strongly opposed termination of Mother's parental rights. The GAL then continued that the other children—A.O., Z.O., and C.C.—"love[d] their mother and [had] a loving relationship with her." Even so, the GAL pointed out that A.O., Z.O., and C.C. had grown up in a situation where Mother's imposed "chaos may [have] seem[ed] normal." As a result, the GAL determined that they did not know what was in their best interests. The GAL then concluded that termination of Mother's parental rights were in A.O.'s, Z.O.'s, and C.C's best interests.

Consequently, although the GAL did not explicitly state if A.O., Z.O., and C.C. wanted their Mother's parental rights terminated, the GAL implicitly did so. That is, by discussing A.O.'s, Z.O.'s, and C.C.'s love for their Mother, as well as A.O.'s, Z.O.'s, and C.C.'s inability to recognize that Mother's parental instructions or the lack of proper

12

parental instructions caused chaos, the GAL tacitly discussed how A.O., Z.O., and C.C. opposed termination of Mother's parental rights. To that end, the GAL did not violate Rule 110A(c).

*Mother's Unfitness*

Next, Mother argues that the district court erred when finding her unfit and unlikely to become fit in the foreseeable future. To fully address Mother's argument, however, we must first review the district court's fact-findings in support of unfitness.

When the district court terminated Mother's parental rights, it made nearly 50 fact-findings. Highly summarized, those fact-findings included a discussion of Mother's historical and ongoing failure to find stable housing, failure to obtain a legal source of income, failure to stop using methamphetamine, failure to complete drug treatment, failure to attend Narcotics Anonymous, failure to complete a mental health evaluation, failure to attend family therapy, and failure to maintain contact with the KVC. The district court then determined that all of the preceding failures by Mother were in violation of her court-ordered case plan tasks.

Based on the preceding fact-findings, the district court further ruled that Mother was unfit and unlikely to become fit for the foreseeable future under K.S.A. 2019 Supp. 38-2269(a). Specifically, the district court quoted each applicable statutory factor under K.S.A. 2019 Supp. 38-2269(b) supporting its unfitness determination, which included the following:

- Mother's emotional illness, mental illness, mental deficiency or physical disability was of such duration or nature as to render her unable to care for the ongoing physical, mental and emotional needs of her children as stated under subsection (b)(1).

13

- Mother's use of dangerous drugs rendered her unable to care for the ongoing physical, mental, or emotional needs of the children as stated under subsection (b)(3);
- Mother's physical, mental, emotional, or sexual abuse of the children or neglect of the children as stated under subsection (b)(4);
- Mother's failure to rehabilitate herself despite reasonable efforts made by appropriate public or private agencies to rehabilitate the family as stated under subsection (b)(7);
- Mother's failure to adjust her circumstances, conduct or conditions to meet the needs of her children as stated under subsection (b)(8); and
- Mother's failure to care for her children when able to and failure to comply with case plan tasks resulting in the children residing outside of Mother's custody for at least 15 of the most recent 22 months as stated under subsection (b)(9). See K.S.A. 2019 Supp. 38-2269(c)(1), (c)(3).

On appeal, Mother first argues that no evidence indicated that she physically, mentally, emotionally, or sexually abused her children or neglected her children. Mother's remaining arguments hinge on her belief that the district court ignored evidence supporting her fitness to parent. Specifically, she argues that the district court ignored the evidence indicating that her substance abuse problems did not affect her ability to parent, that she attempted to adjust her circumstances to the children's needs, and that the KVC did not make reasonable efforts to rehabilitate the family. But in making these arguments, Mother ignores the unfavorable evidence. She also ignores our standards of review.

Turning to Mother's first argument, we note that Mother's argument hinges on the district court's decision to simply quote K.S.A. 2019 Supp. 38-2269(b)(4). She argues that no evidence supported that she physically abused, mentally abused, emotionally abused, sexually abused, *and* neglected her children. Yet, K.S.A. 2019 Supp. 38-2269(b)(4) uses the disjunction "or" between the disjuncts that make up this subsection.

As a result, the district court did not necessarily need to find that Mother had committed all the disjuncts (the types of abuse as well as neglect) under K.S.A. 2019 Supp. 38-2269(b)(4).

Moreover, although no substantiated evidence supported that Mother physically or sexually abused the children, clear and convincing evidence supported that Mother otherwise abused and neglected the children. In a court report submitted by a KVC worker to establish that the children were CINC, the worker reported that N.O. contended that Mother bought him marijuana so he would behave. The worker also reported that C.C. had complained that Mother sometimes threatened to kill her. It is undisputed that while in Mother's placement, all the children had ongoing school truancy issues. And it is undisputed that once Mother's contact was limited to supervised visits, Mother often cancelled those visits or did not show up to the visits. So, Mother's complaint that no evidence supported the district court's unfitness finding under K.S.A. 2019 Supp. 38-2269(b)(4) is baseless.

Next, Mother's remaining arguments require us to reweigh evidence in her favor. In her brief, Mother maintains that she "is not asking us [to] reweigh the evidence." At the same time, she "acknowledges that there may be some evidence regarding [her] unfitness and some doubts about [her] future." In other words, Mother does not challenge the existence of evidence supporting her unfitness. Instead, she challenges how the district court interpreted the evidence of her unfitness. But Mother cannot acknowledge evidence of her unfitness on the one hand and with the other hand contend that she is not asking us to reweigh evidence. Simply put, these two propositions contradict one another.

Moreover, a quick comparison of Mother's arguments with the district court's fact-findings shows that Mother wants us to reweigh evidence. Once again, Mother makes three arguments: First, Mother argues that her substance abuse problems did not affect her ability to parent. In making this argument, she contends that the district court ignored

15

her testimony indicating that her substance abuse problems were a byproduct of her poverty. Second, Mother argues that she attempted to adjust her circumstances. In making this argument, she contends that the district court ignored her testimony about her desire to seek substance abuse treatment, apply for disability, and obtain employment in the near future. Third, Mother argues that KVC did not make reasonable efforts to rehabilitate her family. In making this argument, she contends that the district court ignored her testimony that KVC case worker turnover made it difficult for her to maintain contact with KVC.

The district court, however, did not ignore Mother's testimony. It simply disagreed with her testimony. For starters, the district court explicitly found that "Mother's substance [abuse] issues [] had a direct impact on the family's living conditions and mom's ability to give the children proper care on a consistent basis." Thus, the district court rejected any evidence indicating that Mother's substance abuse problems did not affect her ability to parent. It specifically found that it was Mother's substance abuse problems that caused her poverty as opposed to her poverty causing her substance abuse problems.

Next, the district court found that Mother was "not committed to maintaining sobriety and improving her mental health." It further found that "[e]ven if Mother does follow through with [her plans of] inpatient treatment, obtain[ing] employment and housing . . ., she will need a significant amount of time to show stability before the children could be returned to her." So, the district court rejected Mother's testimony that her future plans to improve herself showed that she was attempting to adjust her circumstances to meet her children's needs. Indeed, the district court explicitly found that Mother's future plans to comply with her case plan tasks were irrelevant because Mother had over seven years to adjust her circumstances while her children's CINC cases were pending.

16

Finally, the district court found that "the evidence show[ed that] Mother ha[d] continually rebuffed the efforts of the [KVC] to maintain contact, rejected available community-based resources, and refused to address her substance abuse issues." Thus, despite Mother's testimony to the contrary, the district court did not believe that KVC worker turnover resulted in KVC failing to make reasonable efforts to rehabilitate the family. Instead, it found that Mother was not committed to receiving KVC's reasonable efforts.

On this final argument, we note that the district court always found that KVC made reasonable efforts to rehabilitate the family. In her brief, Mother insinuates that the district court found KVC had not made reasonable efforts to rehabilitate the family shortly before it terminated her parental rights. But this is not true. Instead, as the State correctly points out in its brief, the district court withheld its reasonable efforts finding as to N.O. and J.O. at an April 2019 hearing because both N.O. and J.O. had run away. So, the district court never found that the KVC failed to provide reasonable efforts to rehabilitate the family.

In summary, Mother's arguments require us to reweigh the evidence in her favor by accepting her testimony as true. Nevertheless, when determining whether a district court properly terminated a parent's parental rights, we do not reweigh the evidence or credibility determinations. *In re B.D.-Y.*, 286 Kan. at 705. Additionally, we must review the evidence in the light most favorable to the State. For this reason, Mother's arguments that the district court erred by finding her unfit and unlikely to become fit in the foreseeable future are baseless as a matter of fact and wrong as a matter of law. See *In re K.W.*, 45 Kan. App. 2d at 354.

*Best Interests of the Children*

Finally, Mother argues that the district court erred when finding that termination of her parental rights was in the children's best interests. Mother's primary argument is that the district court ignored that N.O. and J.O. did not want her parental rights terminated.

Yet, in its decision, the district court recognized that both N.O. and J.O. opposed being placed for adoption. Also, Mother never contests the district court's fact-findings that supported its finding that termination of her parental rights was in the children's best interests. Instead, she contends that the district court should have given N.O.'s and J.O.'s opinions more weight when deciding their best interests. This argument, however, involves reweighing the evidence in her favor. As discussed earlier, we do not reweigh evidence when considering the district court's decision to terminate parental rights. Thus, Mother's argument necessarily fails. *In re B.D.-Y.*, 286 Kan. at 705.

Mother's other arguments are about the district court's best interests findings are similarly meritless. First, in passing, Mother argues that the district court's best interests findings were conclusory. But she never explains which specific fact-findings were conclusory. Simply put, Mother has raised this point incidentally in her brief. In turn, her argument is not properly before us. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (holding that a point raised incidentally in a brief and not argued therein is deemed waived and abandoned). Notwithstanding this problem, Mother's argument ignores that the district court made nearly 50 fact-findings before finding that termination of her parental rights was in the best interests of the children. To that end, her argument is otherwise baseless.

Second, Mother's remaining arguments about her children's best interests essentially repeat her earlier arguments (1) about terminating her parental rights to C.C.

18

but not terminating C.C.'s Father's parental rights, and (2) about the GAL not complying with Rule 110A(c). Nevertheless, as discussed in earlier sections, both of those arguments are meritless.

For the preceding reasons, Mother is not entitled to reversal of the district court's finding that termination of her parental rights was in the children's best interests.

Affirmed.