NOT DESIGNATED FOR PUBLICATION

No. 118,966

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTEREST OF C.E.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed August 31, 2018. Affirmed in part and remanded with directions.

*Aline E. Pryor*, of Kansas City, for appellant father.

*Kayla Roehler*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before MALONE, P.J., MCANANY and POWELL, JJ.

PER CURIAM: The district court terminated the parental rights of the Father of C.E., whom we will refer to as the Child. Father appeals, contending (1) he did not receive a fair trial, (2) the district court erred in presuming he was unfit when no statutory presumptions applied, and (3) the State failed to complete the inquiry into the child's status under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq. (2012).

*Facts*

These proceedings were prompted by a report on January 24, 2017, to the Department of Children and Families (DCF) that Father, age 56, had abused and neglected the Child, his 15-year-old daughter. The Child had lived alone with Father since she was 9 years old when her mother passed away. It was reported to DCF that

1

Father often got drunk, smoked heavily, frequently became angry, followed the Child wherever she went, did not allow her to speak to anyone, and forced the Child to sleep naked without a blanket. DCF took the Child into emergency protective custody.

Two days later, on January 26, 2017, the Child was interviewed by DCF social worker Monica McGlory. The Child said she was suicidal and refused to return to her Father's home. McGlory noted concerns about sexual, emotional, and physical abuse. The Child was transferred to Marillac for acute inpatient treatment.

The next day, on January 27, 2017, the State commenced child in need of care (CINC) proceedings. The district court found that an emergency existed and issued an order of temporary custody.

On February 22, 2017, Father submitted family information in a Native American Heritage Affidavit, which was sent to the Cherokee Nation headquarters in Tahlequah, Oklahoma.

On May 18, 2017, the court determined that the Child was in need of care because she: (1) was "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parent or other custodian;" (2) was "without the care or control necessary for the child's physical, mental or emotional health;" and (3) had been "physically, mentally, or emotionally abused or neglected, or sexually abused." The court adopted interim orders to facilitate reintegration, including instructions for required assessments, income and housing, parenting classes, and drug testing. Father was not allowed visitation with the Child until further order of the court.

On June 6, 2017, the State received a letter from the Cherokee Nation acknowledging that it received a request for determination of the Child's tribal eligibility. But it found the information that was sent to be incomplete. It had sent a request for

2

additional information over 60 days prior but had received no response. It advised the State that it was closing the inquiry, but noted: "Closure of your inquiry does not remove your responsibility for tribal determination under the ICWA if such information exists."

On June 22, 2017, the district court found that the ICWA applicability was undetermined. The court also found that reintegration was no longer a viable goal and ordered that the goal of further proceedings should be either adoption or a permanent custodianship.

On July 11, 2017, the State filed a motion to terminate Father's parental rights to the Child. The State alleged that Father failed to comply with court orders to provide verification of housing, failed to complete a risk assessment, and did not maintain contact with the court services officer. Testimony in the termination proceedings was received at the hearing on October 19, 2017. The matter was then continued to December 5, 2017, for the parties to make their final arguments to the court.

At the termination hearing on October 19, 2017, the Child entered the courtroom with a blanket over her head so as not to see her Father. She was allowed to testify from behind a screen while being accompanied by "comfort people" who were permitted to sit with her during her testimony.

Father objected to the used of the screen and permitting "comfort people" to sit with the Child while she testified. Father argued that use of the screen violated his right to confront and to view the witness. The district court observed that the constitutional right to confront witnesses did not apply in these civil proceedings and overruled Father's objection to use of the screen. Father also argued that the comfort people were likely to influence the Child's testimony with verbal or nonverbal cues. The district court overruled this objection but allowed Father's counsel to sit in a spot where he could observe the Child and the comfort people behind the screen to make sure no signals were

passed between the "comfort people" and the witness. The court admonished the comfort people against giving any "verbal or nonverbal cues to [the witness] as to what an answer should be, or what she should say or do."

Shannon Bisel, a social worker and interview specialist at Sunflower House, testified that the Child told her that Father beat her, yelled at her, and grabbed her hair. He punched her, leaving a mark on her stomach. He frequently sprayed hot water in her face and called her names. He called her a slut and locked her out on the balcony in the snow. If she dropped something accidentally, Father would not let her eat for as much as a couple of days. She was not allowed to sleep with clothes or a blankets. Father would sleep with her or watch her sleep. There were often times when Father would put his hand on her vagina and move it up and down.

Christine Schmitt, the Child's therapist, testified that the Child told her that she wanted to kill herself because she was concerned about being placed back with Father. The Child had "flashback memories, she wants them to stop, and she couldn't figure out any other way to make them stop than to kill herself." After one therapy session when the Child blamed herself for not protecting her mother from abuse by Father, the Child drank toilet bowl cleaner and was hospitalized. The Child told Schmitt that Father physically abused her after she had surgery and Father often called her names. She also told Schmitt that Father made her sleep naked. She said Father put his penis inside of her. She said that when she got into trouble, Father would not allow her to eat. She told Schmitt that she would kill herself if she had to go back to her Father.

Valeri Tuley, therapist with The Villages, testified that the Child told her that Father had physically and sexually abused her. The Child said she generally slept with her Father and was usually wearing nothing. She decided to start being a boy because she felt safer that way and thought no one would try to sexually abuse her. Tuley said that the Child's suicidal thoughts were triggered by flashbacks of her Father's abuse. Tuley stated

4

that the Child's "biggest fear right now is that they would make her go back home to live with her father."

Father called three witnesses, Cynthia Moses, Jay-Jay Thomas Shaffer, and Kaitlyn Barden. Moses, a clinical social worker with Transitional Counseling Services, saw Father for about 10 sessions of therapy. She said that Father denied sexually abusing the Child. He implied that the Child might be having some mental health and substance abuse issues. Moses recommended family therapy if reintegration were an option, but acknowledged that family therapy would be contraindicated if the Child was adamant about committing suicide if forced to participate.

Shaffer testified that the Child was his half-sister by the same mother. Shaffer was surprised by the abuse allegation. He said that the Child never told him Father was abusing her. The Child told him that she wanted to return home and she had made a mistake. She told Shaffer to tell Father that she loved and missed him.

Barden, Shaffer's girlfriend, testified that the Child told her she was scared that Father was going to jail. She said the Child missed her Father and wanted to come home. Barden never witnessed any abuse by Father.

The district court terminated Father's parental rights to the Child, finding Father to be unfit

- for conduct toward the Child of a physically, emotionally or sexually cruel or abusive nature (K.S.A. 2017 Supp. 38-2269[b][2]); and
- for physically, mentally, or emotionally neglecting the Child (K.S.A. 2017 Supp. 38-2269[b][4]).

5

The district court also found that the conditions of unfitness were unlikely to change in the foreseeable future, and it was in the Child's best interests to terminate Father's parental rights. Father's appeal brings the matter to us.

*Child Testifying Behind a Screen*

Father argues the he was denied a fair trial when the court refused to permit him to view the Child's demeanor while she testified behind a screen. Father cites an article in the Kansas Bar Journal, Haney, *The Child Victim/Witness: Balancing of Defendant/Victim Rights in the Emotional Caldron of a Criminal Trial*, 62 J. K.B.A. 38 (January 1993). He fails to explain how the information in the article, which apparently related to criminal trials, supports his specific argument here.

Father states that he should have been permitted to see the Child as she testified "to determine whether she was lying or not." Father suggests that technology should have been used so that she could have testified under "calmer circumstances."

Father couches the district court's action as an abuse of discretion. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). The party asserting an abuse of discretion bears the burden of showing it. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012).

K.S.A. 2017 Supp. 60-243(a) sets the baseline standard for a witness' testimony in a civil proceeding: the testimony of a witness "must be taken in open court." But this statute further provides: "For good cause and in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." K.S.A. 2017 Supp. 60-243(a).

6

More specifically in CINC proceedings, K.S.A. 2017 Supp. 38-2249(d), on motion of any party, the court may permit a child under the age of 13 who has been physically, emotionally, mentally, or sexually abused to testify via video rather than requiring the child to testify in court. The Child in our present case was over 13 years of age.

Here, the court required the traditional in-court testimony of the Child, but it allowed the use of a screen to prevent the Child from seeing Father as she testified. Nevertheless, Father was able to hear all of the testimony, and Father's counsel was in a position to observe the Child's demeanor. The court observed:

> "The right to confront a witness is a constitutional right in a criminal prosecution. This is not a criminal prosecution. So this Court is of the opinion that a physical barrier between a witness and a defendant in a criminal prosecution does not violate their right to confront.
>
> "The—the attorney will have an opportunity to view the witness. The Court views the witness.
>
> "And I believe that a child witness who is alleged to be the victim of a sexual assault—that these are reasonable accommodations that would not violate a defendant's right to confrontation.
>
> "However, we don't even need to get to that, because this is not a criminal prosecution, and there is no a constitutional right to confront the witness.
>
> "I am perfectly satisfied that [Father]'s rights are not being violated by this physical barrier that prevents the witness from seeing him and him from seeing the witness during the time that they testify.
>
> "So that objection will be overruled."

The district court was correct in finding that the Sixth Amendment's Confrontation Clause is limited to a defendant's right in a criminal case. See *In re J.D.C.*, 284 Kan. 155, 165,159 P.3d 974 (2007). The Confrontation Clause of the Sixth Amendment offers Father no protection.

7

Father was represented by counsel at the final hearing. He was not deprived of the opportunity, through his counsel, to observe the child's demeanor and question her on cross-examination. Moreover, the Child provided little in the way of substantive testimony from the stand on the specific acts of abuse and neglect. Most of her answers were that she did not know or did not remember. The substantive evidence was presented, for the most part, through the testimony of her social worker and therapists. The district court did not abuse its discretion in permitting the Child to testify from behind a screen, and the use of the screen did not deprive Father of a fair trial.

*Father in Handcuffs*

Father's next claim arose from events beginning the day before the termination hearing. That day, Father was charged with aggravated indecent liberties. The following day, during a recess in these termination proceedings, Father was arrested and placed in handcuffs. When court resumed, Father's counsel objected to the fact that the Child was present when Father was arrested. Father's counsel stated:

> "So part of my complaint here, Judge, is that while the victim—alleged victim was sitting in the courtroom, my client was cuffed. And I'm certain she heard—in fact, what was being said and what was going on, which certainly doesn't help him and could very definitely influence her testimony. So that's—that's an issue."

Father's counsel did not explain, and the record does not disclose, what was said during this incident that he claims the Child overheard. He stated: "[T]here are two separate issues as far as I'm concerned. One is prejudice to the Court. The other is, quote/unquote, prejudice to the witness, in other words, feeling that she's bolstered, supported, something of that nature."

8

The court responded:

> "I don't think the issue of prejudice before the Court, before the fact finder is—is really an issue . . . I have to be honest with you. I could care less, in . . . terms of my decision making in this case, whether or not . . . the father is criminally charged, whether or not a warrant has been executed upon him or not.
>
> "So taking your issues as they came, . . . there is no prejudice before the Court.
>
> "Secondly, the prejudice to a witness's testimony and how that might alter a witness's testimony is not exactly clear to me. And by saying that, I'm not saying that it can't; but certainly, it could be explored on cross-examination. I just don't know that there is a, per se, prejudice to a witness knowing that—even when the witness is the complaining witness in a case—that a warrant has been executed based on what they've alleged at least outside of the courtroom."

Because Father did not seek any specific relief, the court stated: "I think you've preserved it well for the record. . . . A, I don't know what the remedy would be. And B, I don't see any prejudice to your client."

On appeal, Father directs his attention only to the possible influence this incident had on the Child. He asserts that the Child "saw Father handcuff[ed] during the entirety of Father's first appearances [*sic*] and could hear the entire discussion of the alleged crime." There is no evidence that this incident involved a first appearance. What is clear from the record is that Father was arrested and nothing more.

The only case cited by Father, *In re A.E.S.*, No. 108,584, 2013 WL 2992733 (Kan. App. 2013) (unpublished opinion), does not involve the potential prejudice to a witness who was present while a parent was handcuffed in court. The case merely mentions the fact that watching her Father being arrested and handcuffed after the battery of a neighbor emotionally affected the minor child. 2013 WL 2992733, at *2, 5. We do not find this case to be particularly helpful.

9

For the first time on appeal, Father argues that the district court should have analyzed whether there was a fundamental failure in the proceeding and whether it could continue the termination hearing without an injustice. But that is what the court, in essence, did in concluding that whatever happened in his courtroom did not prejudice Father.

We have no record of what was said, if anything, about Father's charged crime during this incident, and Father had the opportunity to inquire of the witness about this incident during cross-examination. He did not do so. Moreover, Father never asked for any relief when this incident arose; he merely memorialized the incident on the record.

We place a great deal of confidence and deference in the trial judge regarding an incident such as this that occurred in his courtroom. The Child was reluctant in her answers during her direct examination before this incident occurred. In her brief direct testimony that continued after this incident, which takes up only about three pages of the trial transcript, she did not address any of the substantive issues in the case. Her direct examination concluded:

"Q. . . . Did some bad things happen to you when you lived at your dad's house?
"A. I don't want to talk about it."

Her manner of testifying did not change during cross-examination. Most importantly, she was not asked about the details of any of the State's alleged bases for seeking termination of Father's parental rights. If she had been influenced by whatever happened during Father's arrest, she certainly did not act upon it in her testimony that followed. Consequently, we find no abuse of discretion in the district court's decision to continue the termination hearing. The district court stated that it did not see any prejudice, and the Child's continued testimony did not disclose any prejudice on her part arising from her Father's arrest.

10

*Claimed Newly Discovered Evidence*

Next, Father argues he was denied a fair trial when the district court refused to reopen the case to permit him to present what he claimed was newly discovered evidence.

Under K.S.A. 2017 Supp. 60-259(a)(1)(E), the district court may grant a motion for new trial based on newly discovered evidence if the evidence is material and could not have been discovered and produced at trial. It is within the discretion of the district court to grant or deny a motion for a new trial under K.S.A. 60-259(a). A ruling on a motion for new trial will not be disturbed on appeal absent a showing of an abuse of discretion. *Miller v. Johnson*, 295 Kan. 636, 684-85, 289 P.3d 1098 (2012).

The evidence in this termination hearing was presented on October 19, 2017, after which the parties rested. On December 5, 2017, the court reconvened for the parties to make their closing arguments. Just prior to closing arguments, Father's counsel asked to reopen the evidence. Counsel alleged that Father told her that the Child's grandparents, Shaffer, and Barden told Father that the Child wanted to recant her allegations and "come back home." The Child's communication allegedly took place over Facebook. Father's counsel's request was based solely on Father's triple hearsay of what Father hold him that family members said that the Child said. Counsel apparently did not contact Shaffer, Barden, or the grandparents to confirm any of this or confirm that any Facebook communications had been made. Father did not present an affidavit or proffer any evidence other than this triple hearsay that the Child did, in fact, recant her allegations of abuse.

In response the district court noted that Shaffer and Barden had previously stated in their testimony that the Child wanted to be home and she said she may have made a mistake. As the court stated, that was not new evidence. The court stated:

11

"The only thing that would qualify as new evidence would be if the child did, in fact, recant and say, 'What I said happened did not happen.' That would be evidence. That's not what I'm hearing today. I'm hearing that the child is making—I—I don't know—says she wants to take it back."

But the court noted that if the Child did in fact recant her testimony, the court would be open to considering the testimony. "I think that's newly discovered evidence. . . . And I would certainly take that into consideration. But at this point, this—this case needs to be decided. The evidence was closed."

At this final portion of the termination hearing Father was present with his counsel, but the Child was not present. It does not appear that the grandparents, Shaffer, or Barden were present. The purpose of these final proceedings was for the parties to present their final arguments. Opening the evidence at this point would require a further continuance of the matter because the witnesses were not present. Further, the court would have to delay the final arguments of the parties.

The district court did not formally express an outright denial of Father's counsel's oral motion. We take the district court's remarks as an open invitation to Father's counsel to pursue the matter at a later time. While the court orally ruled from the bench after the parties' closing arguments, the judgment was not effective until the filing of the Journal Entry of Judgment on December 13, 2017. Even though the district court stated that its door would be open if Father came forward with newly discovered evidence, Father did not pursue the matter further. Accordingly, we find no abuse of the district court's discretion.

12

*Finding of Unfitness*

Father argues that the district court erred in presuming that Father was unfit when none of the unfitness presumptions existed. Father's argument is confusing. Under K.S.A. 2017 Supp. 38-2271, a presumption of unfitness applies when certain conditions are present. Father predicates judicial error on an improper application of one of these presumptions. But he does not say which one and he makes no argument that the district court erroneously applied *any* presumption of unfitness. In fact, we do not find in the record any reliance by the district court on any presumption. Rather, the district court correctly proceeded under K.S.A. 2017 Supp. 38-2269, which does not set forth any presumption of unfitness.

The argument that Father does make is that there was not clear and convincing evidence to support the termination of his parental rights. He challenges both the district court's finding that he was unfit and the district court's finding that termination was in the Child's best interests.

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights only if it makes three findings:  (1) that there is clear and convincing evidence that the parent is unfit due to conduct or condition which renders the parent unable to care properly for the child; (2) that the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) that termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(a) and (g)(1); see *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

Clear and convincing evidence requires the fact-finder to believe "that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). When determining whether factual findings are supported by clear and convincing evidence, we do not reweigh conflicting evidence, pass on the witnesses'

13

credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). The foreseeable future in CINC proceedings is viewed from a child's perspective because a child's perception of time differs from that of an adult. K.S.A. 2017 Supp. 38-2201(b)(4); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014); *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009).

*— Physically, Emotionally, or Sexually Cruel or Abusive Conduct*

The district court found that this factor applied to Father. See K.S.A. 2017 Supp. 38-2269(b)(2). The Child told Bisel that Father beat her, yelled at her, and grabbed her hair. The Child reported that she was punished by being sprayed in the face with hot water or locked outside on the balcony in the snow. Father withheld food from her as punishment when she accidentally dropped something. The Child told Bisel that she was not allowed to sleep with clothes or a blanket, and Father sexually abused her. She disclosed similar allegations of abuse to Schmitt and Tuley. In addition, the Child told Schmitt that she wanted to kill herself because she was concerned about being placed back in Father's home. She also told Tuley that her Father had physically and sexually abused her. Tuley said that the Child's suicidal thoughts were triggered by flashbacks of her Father's abuse and that the Child's biggest fear was being forced to go back home to live with her Father.

The testimony provided by the State's witnesses provided sufficient evidence to find Father unfit under this factor.

*— Physical, Mental, or Emotional Neglect*

The record contains evidence in support of this factor as well. See K.S.A. 2017 Supp. 38-2269(b)(4). As previously noted, several witnesses testified as to the physical, mental, and emotional neglect that the Child suffered under Father's care. The record is

14

replete with evidence of the Child's reports of physical, mental, or emotional neglect. The testimony provided by the State's witnesses provided sufficient evidence to find Father unfit under this factor.

Father's argument that the State failed to prove that he was unfit is unpersuasive. It is not our role to reweigh the evidence, and we must view the evidence in favor of the prevailing party. There is clear and convincing evidence in the record to support the district court's determination that Father was unfit by reason of conduct or condition which rendered him unfit to care properly for the Child. See K.S.A. 2017 Supp. 38-2269(a).

— *Unlikely to Change in the Foreseeable Future*

Father claims he did not lack the effort to change his circumstances to meet the Child's need for care.

The district court ruled that Father's behavior was unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). The foreseeable future in CINC proceedings is viewed from a child's perspective because a child's perception of time differs from that of an adult. K.S.A. 2017 Supp. 38-2201(b)(4); *In re M.H.*, 50 Kan. App. 2d at 1170; *In re S.D.*, 41 Kan. App. 2d at 790.

The court may predict Father's future continued unfitness based on his past behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Here, the Child's allegations of abuse covered a period of six years.

The Child threatened to commit suicide if placed back in her Father's home, and her biggest fear was returning home. Under these circumstances, the court found that reintegration was not a viable alternative.

15

The Child was 15 years old at the time of the termination hearing, and any chance for adoption or a permanent guardianship would need to be pursued before she reached the age of majority. Courts do not have to gamble with a child's future nor experiment with the child's welfare before taking action. A child should not have to endure the inevitable to his or her detriment in order to give the parent an opportunity to prove his or her fitness as a parent. *In re Price*, 7 Kan. App. 2d at 480 (quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]). We find clear and convincing evidence in the record to support the district court's determination that Father's unfitness was unlikely to change in the foreseeable future.

— *Best Interests of the Child*

Finally, we consider the Father's challenge to the district court's finding that terminating his parental rights was in the Child's best interests. See K.S.A. 2017 Supp. 38-2269(g)(1). The district court was in the best position to determine the best interests of the child, and we cannot overturn that determination without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010).

In determining the best interests of a child, "the court shall give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would be best served by termination of parental rights, the court shall so order." K.S.A. 2017 Supp. 38-2269(g)(1). The court should weigh the benefits of permanency for the child without the presence of a parent against the continued presence of the parent and the attendant issues created in the child's life. The court should further consider the relationship between the parent and children and the trauma that may be caused by termination. See *In re K.R.*, 43 Kan. App. 2d 891, 903-04, 233 P.3d 746 (2010).

16

The record shows that the district court properly considered the Child's best interests when terminating Father's parental rights. Father contends that there is no firm basis to determine whether his conduct was inappropriate and that the court should have ordered supervised visitation through a one-way webcam or video chat. The district court found that if it were to try to allow reintegration with Father that it would be putting the Child's "very life at stake." Even if alternatives existed, we find no abuse of discretion in the district court's finding that it was in the best interests of the Child to terminate Father's parental rights.

*Indian Child Welfare Act*

Finally, Father argues that the district court failed to require the State to complete the inquiry into the Child's status as an Indian Child under the ICWA. Compliance with ICWA is a question of law over which we exercise unlimited review. *In re A.J.S.,* 288 Kan. 429, 431, 204 P.3d 543 (2009).

The ICWA, 25 U.S.C. § 1901 et seq. (2012), applies to involuntary proceedings to terminate the parental rights of parents of Indian children. 25 U.S.C. § 1903(l)(ii) (2012); 25 U.S.C. § 1911(a) (2012). In Kansas, a child in need of care proceeding is generally governed by the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq., "'except in those instances when the court knows or has reason to know that an Indian child is involved in the proceeding, in which case, the Indian child welfare act of 1978 . . . applies.'" *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010.) An "'Indian child' means any unmarried person who is under age eighteen and either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

Tribal courts have exclusive jurisdiction over proceedings involving children residing on or domiciled within a reservation and concurrent jurisdiction with state courts

over foster care or termination of parental rights proceedings involving children not domiciled on a reservation. See *In re M.F.*, 290 Kan. at 149 (citing 25 U.S.C. §1911[a]).

Father submitted family information in his Native American Heritage Affidavit on February 22, 2017, which was sent to the Cherokee Nation headquarters in Tahlequah, Oklahoma. On June 6, 2107, the State received a letter from the Cherokee Nation noting that its previous request for more information to determine the Child's heritage went unanswered. As a result, the Cherokee Nation closed the inquiry with the caveat: "Closure of your inquiry does not remove your responsibility for tribal determination under the ICWA if such information exists." On June 22, 2017, the district court found that the ICWA applicability was undetermined.

The State concedes that the facts of this case are nearly identical to those in *In re D.H.*, 54 Kan. App. 2d at 504. In that case, the Cherokee Nation sent a reply to the State noting that it was impossible for the Cherokee Nation to confirm or deny the eligibility for enrollment in the tribe without the specified information. No further action was taken to provide additional information to the Cherokee Nation. A panel of this court found:

> "If the evidence suggests the court is dealing with an Indian child, the court must consider the child to be an Indian child until the tribe advises otherwise. The Bureau of Indian Affairs Guidelines, in effect at the time of the termination of parental rights here, control here. They state, 'If there is any reason to believe the child is an Indian child, the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian Tribe.' BIA Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 FR 10146 Section A.3(d) (February 25, 2015)." 54 Kan. App. 2d at 502.

The court noted that notice to the tribe was mandatory under ICWA, and the State had an obligation to provide the missing information. Regarding the notification requirements, the BIA Guidelines state that "[t]he notice requirement includes providing

18

responses to requests for additional information, where available, in the event that a tribe indicates that such information is necessary to determine whether a child is an Indian child." BIA Guidelines for State Courts and Agencies in Child Custody Proceedings, 80 Fed. Reg. 10,146 B.6(1) (Feb. 25, 2015).

Here, the record does not contain any additional information about the State's response to the Cherokee Nation's request for additional information. According to the Guidelines, "the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe." BIA Guidelines, Section A.3(d). Here, the court must consider the Child to be an Indian child until the Cherokee Nation rules that she is not.

As in *In re D.H.*, there is sufficient evidence in the record to support a finding that Father is unfit and it is in the best interests of the Child to terminate his parental rights. Nevertheless, we must remand the case for further proceedings to determine, after proper notice to the Cherokee Nation, if the Child qualifies as an Indian child. See 25 C.F.R. § 23.111(d) (Dec. 12, 2016). The State concedes that its experts did not qualify as "qualified experts" under ICWA. If the court finds that the Child is not an Indian child, the termination ruling does not need to be set aside. But if the Child is found to be an Indian child, then the district court must proceed under the ICWA. See *In re D.H.*, 54 Kan. App. 2d at 504.

Affirmed in part and remanded with directions.