NOT DESIGNATED FOR PUBLICATION

No. 127,331

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of D.M.H. Jr., M.M.H., M.L.H., and D.M.H.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD MACIAS, judge. Submitted without oral argument. Opinion filed November 27, 2024. Affirmed in part, reversed in part, and remanded with directions.

*Grant A. Brazill*, of Morris Laing Law Firm, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before SCHROEDER, P.J., MALONE and BRUNS, JJ.

PER CURIAM: The natural father (Father) timely appeals from the district court's decision to terminate his parental rights to his four children all under the age of 18. Father now argues (1) the district court erred in finding he was likely to remain unfit to parent the children for the foreseeable future, and (2) the State failed to properly comply with the notice requirements under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901 et seq., when it sent information to determine whether the children were Indian children to the relevant tribes/nations in which Mother claimed the children may be eligible for membership.

After a careful review of the record, we find the district court correctly found Father unfit and his unfitness was likely to continue for the foreseeable future. We further conclude the district court's decision to terminate Father's parental rights was supported

1

by clear and convincing evidence and a sound exercise of its discretion. However, we find the State failed to properly comply with the notice requirements under ICWA, and that failure requires we remand the matter to the district court for proper notice to be provided as required by ICWA. Therefore, we affirm in part, reverse in part, and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Father has four minor children subject to this action: D.M.H. Jr., M.M.H., M.L.H. and D.M.H. (collectively, the children). The natural mother (Mother) of the children is not a party to this appeal, although she separately appealed from the termination of her parental rights and another panel of our court recently reversed and remanded. *In re D.M.H.*, No. 127,428, 2024 WL 4314303, at *1 (Kan. App. 2024) (unpublished opinion), *petition for rev. filed* October 28, 2024. The facts of the case were set forth in Mother's appeal.

> "In June 2021, the children were placed in protective custody due to abandonment. At the time, the children resided with Mother, and Father was incarcerated. Police officers observed then-four-year-old D.M.H. standing alone near an intersection. Shortly thereafter, another individual approached the officers with then-six-year-old M.M.H. and told the officers they were looking for a lost dog. M.M.H. also informed the officers that he and his siblings lived in a trailer with no electricity. Officers took D.M.H. and M.M.H. to the address they were provided and made contact with Mother's boyfriend, who told the officers he had not seen or heard from Mother for approximately 12 hours. He also informed the officers there had been a serious disturbance between him and Mother, and then-nine-year-old D.M.H. Jr. (the eldest of the four siblings) had been present during the incident. Mother was contacted by telephone and returned with D.M.H. Jr." 2024 WL 4314303, at *1.

Mother informed the officers she left the three younger children at the house because they were sleeping. She claimed the homeowner was looking after the children;

however, the homeowner denied she was asked to care for the children and stated she was not at the residence when Mother left. Mother informed the officers she and the children were residing with her maternal aunt (Aunt). But upon contacting Aunt, the officers learned Mother and the children had not resided with her for over a year. Mother was then unable to provide the officers with an address where she and the children had access to food, water, electricity, and proper shelter. She also admitted she would test positive for marijuana if tested that day.

The Kansas Department for Children and Families (DCF) became involved in the case and performed an investigation, during which Father informed DCF he had been incarcerated for 10 months and had been charged with aggravated battery against Mother. He further reported Mother had started using methamphetamine 2 years earlier and the family had been homeless for approximately 10 months. Father further stated the children had stayed with relatives after he was incarcerated.

Two days after the children were taken into protective custody, the State filed a petition asserting each of the children was a child in need of care (CINC). The State alleged Father was not an appropriate placement for the children because he was presently incarcerated and had a history of domestic violence. A temporary custody hearing was held the following day, at which Father appeared remotely. Mother completed an affidavit and questionnaire of Native American heritage wherein she indicated her father (Maternal Grandfather) was an enrolled member of the Cherokee Nation. Mother was given a genogram to provide additional identification regarding her heritage and enrollment status; however, she never returned it. Father waived his right to an evidentiary hearing on temporary custody. The district court placed the children in the custody of DCF to be put in an out-of-home placement, with further discretion for DCF to place the children in the custody of either parent with 10 days' notice to all parties.

3

The State sent notice to the relevant tribal authorities pursuant to ICWA, which included the limited identifying information Mother provided. However, the notice did not include Maternal Grandfather's name or identifying information and did not include Mother's maiden name. The notice stated Mother had not completed the genogram she was provided, and Mother reported she sent an application to the Tribe for a roll card, which she had not received.

In August 2021, the district court held a hearing on the State's CINC petition. Father appeared and entered a no-contest statement to the petition. The district court found ICWA did not apply. It adjudicated the children as CINC, placed them in DCF custody, and ordered them to remain in out-of-home placement.

In January 2022, the district court held a permanency hearing at which Father appeared. The State introduced letters from the Eastern Band of Cherokee Indians (the Eastern Band) and the Cherokee Nation as exhibits, which the district court admitted into evidence. The letter from the Cherokee Nation indicated it had examined its tribal records and, based on the information provided, it was unable to find Mother or the children in its records. Thus, the children were not "Indian children" within the meaning of ICWA and the Cherokee Nation did not have standing to intervene. Similarly, the letter from the Eastern Band reflected there was no information in its tribal records showing the children were members or eligible to enroll as members. Therefore, the Eastern Band likewise concluded it did not have standing to intervene. Accordingly, the district court found ICWA did not apply.

In November 2022, the State filed a motion for finding of unfitness and termination of Father's parental rights, alleging Father was unfit under:

- K.S.A. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child");

- K.S.A. 38-2269(b)(5) ("conviction of a felony and imprisonment");
- K.S.A. 38-2269(b)(7) ("failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family");
- K.S.A. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child");
- K.S.A. 38-2269(c)(2) (failure to maintain regular visitation, contact, or communication with the children or their custodian); and
- K.S.A. 38-2269(c)(3) (failure to carry out a reasonable, court-approved plan for reintegration of the children into the parental home).

In February 2023, the district court held a hearing on the State's motion. The parties did not present any evidence; rather, Father stipulated, without objection, he was presently unfit and the evidence provided in the State's motion was a proper basis for a finding of unfitness. After discussing Father's rights with him, the district court accepted the stipulation and found him unfit under K.S.A. 38-2269(b)(4), (b)(5), (b)(7), (b)(8), and (c)(3).

In September 2023, the district court held a hearing on the State's motion for finding of unfitness and termination of parental rights. At the outset of the hearing, the State informed the district court it had conferred with Mother's attorney, and Mother believed ICWA applied through Maternal Grandfather. The State explained notice had been sent to all federally recognized Cherokee tribes and the Bureau of Indian Affairs (BIA). Although the State believed the available information it had reflected ICWA did not apply, the State asked the district court to proceed with caution by withholding its ruling to send additional notice with Maternal Grandfather's name to determine if ICWA did, in fact, apply. Mother's attorney informed the district court Maternal Grandfather died in 2017, so it was impossible for him to appear, and it was necessary to provide the Tribes with his name to determine the children's eligibility for enrollment. The district

court agreed to hear evidence but withhold its ruling for further information regarding the children's status under ICWA.

The district court proceeded with the evidentiary hearing and heard testimony from Mother; Father; the children's therapists, Diane Glenn and Lee Herring; and various caseworkers. During a lunch recess, the State contacted the ICWA eligibility unit of the Cherokee Nation via email and provided Maternal Grandfather's name and date of birth. The Cherokee Nation responded Maternal Grandfather was an enrolled member, but Mother and the children were not; therefore, ICWA did not apply because the children were not (1) enrolled members of the Tribe, or (2) biological children *of an enrolled member* and eligible for enrollment. However, the Cherokee Nation clarified the children were *eligible for enrollment*, but either they had to be enrolled, or Mother had to be enrolled before they could be considered Indian children under ICWA. The State forwarded these emails to the district court and all parties.

Herring testified she was the therapist for the two older children, D.M.H. Jr. and M.M.H. Herring testified the two did not want to open up about Father. In fact, M.M.H never spoke of Father. Herring expressed serious concern about the amount of time the two had already spent in foster care as well as the significant amount of additional time they might spend if the situation remained unchanged. Herring believed the two needed stability and permanency sooner rather than later, and it was better to terminate Father's parental rights than risk the boys becoming worse if they continued to wait.

Glenn testified she was the therapist for the two younger children, D.M.H. and M.L.H. Glenn worked with the two on a variety of issues, including anger, anxiety, and irritability, and both had made some progress, particularly when they began taking medication. Glenn testified the boys had a difficult time in foster care and both spoke as though they felt they did not have a home. Further, neither of the boys talked about

6

Father. Based on her work with the boys, Glenn felt terminating Father's parental rights would not adversely affect them.

Wendy Wentworth testified she had been the case supervisor for St. Francis Ministries (SFM)—the agency providing case management—for approximately 11 months. She believed termination of Father's parental rights was in the children's best interests. Specifically, she felt continuing not to have permanency would be detrimental to the children.

Sierra Ontiberos testified she was the permanency specialist assigned to the case by SFM and had been involved since the temporary custody hearing. Father had been incarcerated when the case began and remained incarcerated throughout the pendency of the case. Ontiberos provided Father a list of his case plan tasks and generally maintained regular contact with him. She testified the children could not be reintegrated with Father based on his incarceration. Once Father was released from custody, he would need to provide proof of suitable and stable housing and employment and demonstrate he was able to care for the children. She believed it would be at least 16 to 18 months before reintegration was possible. Ontiberos felt termination of Father's parental rights was in the children's best interests given the amount of time they would have to wait otherwise.

Father testified he had been incarcerated for a total of three years, one of those spent in prison. Father stated he was convicted of aggravated burglary, aggravated domestic battery, stalking, and violation of a protective order. Mother was the victim of those crimes. Father acknowledged his earliest release date would be at least a year away. Father agreed SFM had done everything possible for him while he was incarcerated. Father admitted his incarceration affected the children as he was unable to be with them.

Father testified he was presently employed and was going to be transferred to the work release facility at Winfield Correctional Facility. Once he was moved, Father would

work 50 or more hours per week. Father testified he completed an online parenting class and enrolled in a domestic violence class, which he still had about three-and-a-half hours to complete. When asked what he learned from the parenting class, Father said it was all things he already knew because he had always been a good parent. However, Father admitted being incarcerated for three years was not good parenting. Father also felt that his history of domestic violence did not affect his ability to be a good parent because it did not happen in front of the children.

After hearing the testimony, the district court allowed the parties to make closing arguments but declined to rule. Instead, it took the matter under advisement and scheduled another hearing for January 2024 to announce its ruling.

At the outset of the January 2024 hearing, the district court asked the parties if any preliminary matters needed to be addressed before it announced its ruling. The parties did not have any preliminary matters, so the district court proceeded with its ruling. The district court stated the ICWA issue had been raised in the termination hearing and was further investigated, but the available information showed ICWA did not apply. Ultimately, the district court terminated Father's parental rights.

The district court noted Father previously stipulated to his unfitness and was presently incarcerated and would remain so for at least another 11 months, possibly up to another 3 years. The district court found Father remained unfit and his unfitness was likely to continue for the foreseeable future given his ongoing incarceration. The district court believed there could be at least another 18 months before reintegration was possible. The district court further noted Father's lengthy criminal history, which included domestic violence, and was disappointed Father, during his testimony, downplayed his role in the domestic violence and the effect it had on the children. The district court further found, contrary to Father's claims, there was evidence that one of the children was aware of Father's domestic violence against Mother. The district court was additionally

8

concerned that once Father was released, he would no longer be supervised and would be put back in the same situation as he was when he committed past acts of domestic violence.

The district court found there was clear and convincing evidence Father was unfit and would continue to remain unfit for the foreseeable future under K.S.A. 38-2269(b)(4), (b)(5), (b)(7), and (c)(3). The district court also found it was in the children's best interests to terminate Father's parental rights to his four children. Additional facts are set forth as necessary.

ANALYSIS

*Father Was Unfit and His Unfitness Was Likely to Continue for the Foreseeable Future*

Father acknowledges he stipulated to being presently unfit; therefore, the issue on appeal only concerns whether the conduct or condition rendering him unfit was likely to continue for the foreseeable future. The State acknowledges the district court made a finding on the record there was not clear and convincing evidence Father was unfit under K.S.A. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"). Accordingly, that factor cannot support the district court's decision. However, we observe the four remaining factors on which the district court relied—K.S.A. 38-2269(b)(4), (b)(5), (b)(7), and (c)(3)—were properly supported.

A parent has a constitutionally recognized fundamental right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, parental rights for a child may be terminated only upon clear and convincing proof of parental unfitness. K.S.A. 38-2269(a); *Santosky*, 455 U.S. at 769-70;

*In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014). In reviewing a district court's termination of parental rights, we view all evidence in the light most favorable to the prevailing party to determine whether a rational fact-finder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). Clear and convincing evidence is evidence sufficient to establish the truth of the facts asserted is highly probable. This is an "'intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt.'" *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018). In making this determination, we do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

As provided in K.S.A. 38-2269(a), the district court must find "by clear and convincing evidence that the parent is unfit by reason of conduct or condition," making him or her "unable to care properly for a child" and the circumstances are "unlikely to change in the foreseeable future." As another panel of this court said:

> "When assessing the foreseeable future, this court uses 'child time' as the measure. The Revised Kansas Code for Care of Children—[K.S.A. 38-2201 et seq.]—recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019).

See K.S.A. 38-2201(b)(4).

In making an unfitness determination, "[a] district court may look to a parent's past conduct as an indicator of future behavior." *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018). In other words, "[p]arental unfitness can be judicially predicted from a parent's past history." *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion).

*K.S.A. 38-2269(b)(4)—Neglect*

Father first argues the district court erred in finding his unfitness under this factor was likely to continue for the foreseeable future. He asserts the district court never articulated what facts or findings it relied on in making this determination. However, as the State points out, a party bears the responsibility to object to inadequate findings of fact and conclusions of law to give the district court an opportunity to correct any alleged inadequacies. *In re Guardianship and Conservatorship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019). Here, Father made no objection to a lack of findings; therefore, we presume the district court made all findings necessary to support its decision. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 510, 509 P.3d 1211 (2022). Based on Father's lack of objection, we decline to address this point further. But even if Father were correct, it would not change our conclusion because the remainder of the district court's findings are properly supported by the record.

*K.S.A. 38-2269(b)(5)—Felony Conviction and Imprisonment*

There is no dispute Father was convicted and imprisoned for committing numerous crimes, including felonies involving domestic violence against Mother. Father's argument on this point is essentially an invitation for us to reweigh the evidence, which we cannot do. *In re B.D.-Y.*, 286 Kan. at 705. While Father seemed to make efforts toward reintegration while in prison, the children could not be returned to him while he remained incarcerated. At the time of the termination hearing, Father was still subject to more than a year of incarceration before his earliest possible release. We have no hesitation in finding this rendered him unfit for the foreseeable future when using "'child time'" as a measure. See *In re M.S.*, 56 Kan App. 2d at 1263.

11

*K.S.A. 38-2269(b)(7) and (c)(3)—Failure of Reasonable Efforts and Failure to Carry Out a Reasonable Reintegration Plan*

Father essentially argues the factors under K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by appropriate public or private agencies to reintegrate the family) and K.S.A. 38-2269(c)(3) (failure of parent to carry out a reasonable court-approved reintegration plan) should be considered collectively. We agree insofar as the predominant common issue leading to Father's ongoing unfitness under these factors was his imprisonment, which prevented him from progressing any further on his case plan tasks and prevented his caseworkers from providing additional resources. While Father makes numerous arguments about the progress he made during the pendency of the case, we must again decline to reweigh the evidence. See *In re B.D.-Y.*, 286 Kan. at 705. Father agreed the caseworkers had done everything they could for him given his situation. But the case plan could not progress further toward reintegration as Father had at least 13 months left on his sentence at the time of the termination hearing, and Ontiberos testified it would likely take an additional 16 to 18 months before Father would be able to reintegrate with the children. Again, we have no hesitation in finding this rendered him unfit for the foreseeable future when using "'child time'" as a measure. See *In re M.S.*, 56 Kan. App. 2d at 1263.

The district court did not err in finding Father was unfit and the conduct or condition rendering Father unfit was likely to continue for the foreseeable future.

*Termination of Father's Parental Rights Was Proper*

Upon making a finding of unfitness of the parent, the district court "shall consider whether termination of parental rights . . . is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). The district court makes the best-

interests determination based on a preponderance of the evidence, which is essentially entrusting the district court to act within its sound judicial discretion. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. We review a district court's best-interests determination for an abuse of discretion,

> "which occurs when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error. In determining whether the district court has made a factual error, we review any additional factual findings made in the best-interests determination to see that substantial evidence supports them. [Citation omitted.]" 50 Kan. App. 2d at 1116.

Father, as the party asserting the district court abused its discretion, bears the burden of showing such abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

In reviewing the district court's termination of parental rights, we view all the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. *In re K.W.*, 45 Kan. App. 2d at 354. Again, we do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

Father argues the district court erred in making its best-interests determination because it relied on evidence from therapists who lacked sufficient first-hand knowledge. We observe this argument goes to the weight and credibility of the evidence, which are not proper questions for us to resolve. *In re B.D.-Y.*, 286 Kan. at 705. Here, the district court heard testimony from Herring, who worked with D.M.H. Jr. and M.M.H. Herring testified the two felt stuck from being in foster care for so long and expressed serious concerns about how remaining in foster care for another six months to two years would affect them. The district court also heard testimony from Glenn who worked with D.M.H.

13

and M.L.H. Glenn testified the two had made improvements while taking medication over the previous six months. However, Glenn noted foster care had also been difficult for the two. Additionally, Glenn testified D.M.H. and M.L.H. never spoke about Father; therefore, she felt terminating Father's parental rights would not have a negative effect on the two.

We observe no error of fact underlying the district court's termination decision. The evidence reflected the children needed permanency, which would not be possible for a significant time given Father's incarceration and the time reintegration could take upon his release. Father also identifies no error of law in the district court's decision, nor does he demonstrate the district court's decision is such that no reasonable person would agree with it. Accordingly, we find Father has not met his burden to show an abuse of discretion in the district court's decision to terminate his parental rights in the best interests of the children.

*The State's Notice to the Cherokee Nation Was Defective*

*Standard of Review*

Determining whether the district court erred in finding ICWA did not apply requires us to engage in statutory interpretation, which presents a question of law subject to unlimited review. *In re A.J.S.* 288 Kan. 429, 431, 204 P.3d 543 (2009). To the extent the district court's ICWA determination is dependent on its factual findings, we review those findings for substantial competent evidence. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014) (standard of review for mixed questions of fact and law).

*Discussion*

Ordinarily, proceedings involving a parent's rights to a child are governed by the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq. However, in situations where a court knows or has reason to know an Indian child is involved, ICWA applies. See K.S.A. 38-2203. Under ICWA, an Indian child is defined as any unmarried person under the age of 18 who is either (1) an enrolled member of an Indian tribe, or (2) is eligible for membership in an Indian tribe and is a biological child of an enrolled member of an Indian tribe. 25 U.S.C. § 1903(4). If the evidence suggests the child may be an Indian child within the meaning of ICWA, notice must be sent to the applicable Indian nation(s) or tribe(s) or to the BIA so an interested nation or tribe may intervene. 25 C.F.R. § 23.111(a)-(e). Where an Indian child does not live on tribal land, the tribal court has concurrent jurisdiction with the state court over involuntary child custody proceedings. 25 U.S.C. § 1911(b).

Here, Father argues the district court erred in determining ICWA did not apply, asserting the notice sent by the State to the various Tribes was deficient. Specifically, Father points to the notice requirements of 25 C.F.R. § 23.111(d)(1)-(d)(4), which provide:

> "(d) Notice must be in clear and understandable language and include the following:
> > "(1) The child's name, birthdate, and birthplace;
> > "(2) All names known (including maiden, married, and former names or aliases) of the parents, the parents' birthdates and birthplaces, and Tribal enrollment numbers if known;
> > "(3) If known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents;
> > "(4) The name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member)."

15

Father argues the notice was deficient as it failed to include information required under 25 C.F.R. § 23.111(d)(2) and (d)(3). Specifically, the notice did not contain the names of the children's maternal grandparents. In support of his argument, Father cites to *In re D.H.*, 54 Kan. App. 2d 486, 401 P.3d 163 (2017). There, the natural mother argued the State's notice "omitted important information—the maiden name, birthdate, and direct lineage of the paternal grandmother." 54 Kan. App. 2d at 501. The panel found her argument persuasive, noting the response from the Cherokee Nation indicated the child was not an Indian child "'based on the information exactly as provided by you. Any incorrect or omitted information could invalidate this determination.'" 54 Kan. App. 2d at 500. The response further stated: "'If you wish to send additional information, please respond in writing with the additional lineage.'" 54 Kan. App. 2d at 500.

The panel explained: "'The notice requirement includes providing responses to requests for additional information, where available, in the event that a tribe indicates that such information is necessary to determine whether a child is an Indian child.' BIA Guidelines, Section B.6(l)." *In re D.H.*, 54 Kan. App. 2d at 502-03. Based on the language in the Cherokee Nation's response, the panel concluded "the letter from the Cherokee Nation can be treated as a request for more information." 54 Kan. App. 2d at 503. Accordingly, the panel reversed and remanded so the necessary information could be sent to the Cherokee Nation to make a proper ICWA determination. 54 Kan. App. 2d at 504.

The response from the Cherokee Nation here is very similar to its response in *In re D.H.* In fact, some of the wording is identical as it also states its determination was "based on the information exactly as provided by you. Any incorrect or omitted information could invalidate this determination." Further still, the Cherokee Nation's response here stated: "If you wish to send additional information, please respond in writing including the child's name and date of birth so we can reference the correct file." Like *In re D.H.*, this too should have been treated as a request for additional information.

Granted, there is some distinction here because the State later contacted the Cherokee Nation by email to provide Maternal Grandfather's identifying information. But the State's email did not contain Mother's full name, *including her maiden name*. It also did not include any information regarding Maternal Grandmother, who Mother stated had sent in enrollment documents for her when she was a child, i.e., when Mother presumably went by her maiden name or some other name. This raises a significant concern because Mother's status as a tribal member was the critical fact to the Cherokee Nation's ICWA determination. There was no dispute the children were not currently enrolled members of the Tribe, but it was also undisputed they were eligible for enrollment. Because this determination was made on the basis of Mother's lineage, it naturally follows Mother was likewise *eligible* for enrollment. Here, the only impediment to the children's status as Indian children was the Cherokee Nation's determination Mother was not an enrolled member. But it is impossible to determine from the present record what information (or lack thereof) was relied on in concluding Mother was not a member.

Another panel of our court recently reversed and remanded Mother's appeal based on the deficient ICWA notice sent by the State. See *In re D.M.H.*, 2024 WL 4314303, at *5. We agree with the reasoning set forth therein and find it should apply here because this issue relates to the same notice.

Simply put, the State provided some, but not all, of the information necessary for the relevant tribal authorities to make this determination through its notice and subsequent follow-up. Therefore, we remand with directions for the district court to ensure the State sends proper notice to the Cherokee Nation with *all* the information required under 25 C.F.R. § 23.111(d)—particularly, Mother's *full* identifying information *including her maiden name and any other name(s) she has used*—as well as Maternal Grandmother and Maternal Grandfather's names as well as any other identifying information available about them. Only then can it conclusively be determined whether the children are Indian children subject to ICWA.

If proper notice is given to the Cherokee Nation and it is determined the children are not Indian children subject to ICWA, the district court's termination of Father's parental rights need not be set aside, and the district court can simply reaffirm its prior decision. However, if it is determined the children are Indian children, the district court must set aside its termination decision, and all further proceedings must be in accordance with ICWA. See *In re D.H.*, 54 Kan. App. 2d at 504.

Affirmed in part, reversed in part, and remanded with directions.