NOT DESIGNATED FOR PUBLICATION

No. 128,382

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.O., a Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Submitted without oral argument. Opinion filed August 8, 2025. Affirmed.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Overland Park, for appellant.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before COBLE, P.J., ISHERWOOD and HURST, JJ.

PER CURIAM: Mother appeals from the district court's order terminating her parental rights to R.O. She argues that the district court erred in two ways: (1) by failing to comply with the process that the Indian Child Welfare Act (ICWA) mandates must be completed before a district court can order foster care placement for an Indian child; and (2) by neglecting to consider the physical, mental, and emotional needs of the child before terminating Mother's parental rights.

Mother is correct that before an Indian child can be placed into foster care, ICWA requires the State to follow specific procedures for notifying the child's potential tribe of an impending foster care placement proceeding. Further, before such placement can be ordered, ICWA also requires the district court to make a "determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in

1

serious emotional or physical damage to the child." 25 U.S.C. § 1912(e). ICWA does not, however, demand adherence to these foster care placement rules when there is an urgent need to remove the child from the home to insulate them from harm. The circumstances of this case necessitated R.O.'s expedited removal from his parents' custody; thus, the district court did not contravene ICWA's mandates when it ordered foster placement for the child.

Finally, K.S.A. 38-2269(g)(1) directs the district court to consider the child's best interests before severing a parent's rights to that child. The district court's oral pronouncement of its ruling concerning termination and its corresponding written order reflect that statutory obligation was acknowledged and fully satisfied here. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

R.O. tested positive at birth for methamphetamine, opiates, and amphetamines. The child's mother (Mother) tested positive for the same substances. These tests resulted in an intervention by the Missouri Department of Social Services (MDSS) R.O. was eventually returned to his parents' custody, but MDSS did establish a safety plan for R.O. which required the child to reside part-time with a family friend, H.U., under a power of attorney.

In June 2022, the Kansas Department for Children and Families (DCF) received a report from the Children's Mercy Safety, Care, and Nurturing (SCAN) Clinic that R.O. suffered physical abuse and may have been burned by a space heater.

On July 16, 2022, Mother and Father moved from Missouri to Kansas, and the following day, they picked R.O. up from H.U.'s home for an overnight visit. When R.O. returned to H.U.'s home, H.U. noticed the child had bloody stools, bruises on his left ear,

2

scratches, and a sunburn. H.U. promptly took R.O. to the Children's Mercy SCAN Clinic, who in turn reported to DCF that R.O. had bruising on his ear and right ankle, and was in danger of being whisked off by the parents—a particularly troublesome risk given the parents' history of domestic violence, drug use, and inability to provide stable housing for the child.

The State petitioned the district court to find that R.O. was a child in need of care (CINC) and noted he may be an Indian child because Father claimed Cherokee Indian heritage. A temporary custody hearing was conducted the same day and while neither parent personally appeared, each was represented at the hearing by counsel; R.O. appeared through a guardian ad litem. The district court found that R.O. was born drug-exposed and while he was eventually reunited with his parents, he was later found to have sustained abuse while in their custody. It found R.O. was likely to sustain harm if not immediately removed from his parents' care and entered an order to have the child placed in temporary DCF custody.

The district court recalled the case six days later upon Mother's request for a rehearing. Faith Watashe, a child welfare specialist knowledgeable in ICWA's mandates, represented the Cherokee Nation at the hearing. The district court again determined that R.O. is properly considered an Indian child given Father's enrollment as a member of the Cherokee Nation and that ICWA applied, pending verification of tribal membership. The district court's conclusion remained the same, and an order was entered to place R.O. in the temporary custody of DCF.

Mother appeared in person and with counsel at the next court hearing on September 19, 2022. Watashe testified and the district court found her to be a qualified expert employed by the Cherokee Nation. The court reiterated that R.O. was an Indian child and, based on Watashe's testimony, the child's foster placement satisfied ICWA's requirements. The district court also noted Watashe's testimony that the conclusion the

3

court reached at both temporary custody hearings, finding sufficient cause existed for R.O.'s emergency removal from the home, was valid under ICWA.

The district court held a CINC hearing in October 2022 at which Mother appeared through counsel and Watashe was again present on behalf of the Cherokee tribe. The district court found that R.O. was a child in need of care and cited three bases in support of its conclusion: (1) R.O. was without adequate parental care, control, or subsistence, and this condition was not due solely to lack of financial means; (2) the child was without the care or control necessary for his physical, mental, or emotional health; and (3) he was physically, mentally, or emotionally abused or neglected. Mother was ordered to cooperate with KVC Behavioral Healthcare (KVC), and the district court clarified that directive included an obligation to follow the agency's recommendations concerning mental health and substance abuse services. Finally, the district court explained that it was KVC that located a foster family placement for R.O. and Watashe approved that placement on behalf of the tribe.

The district court later filed a formal reintegration plan, outlining the steps necessary for Mother to reunify with R.O. The plan required Mother to: (1) maintain safe and suitable housing, (2) maintain employment or other income to meet the needs of the family, (3) complete psychological and substance abuse assessments and follow all recommendations, (4) follow visitation schedules and rules, and (5) follow all court orders and KVC directives. While the case manager reviewed each step of the plan with Mother during an in-person meeting, Mother refused to attach her signature to the plan.

The State ultimately moved to terminate Mother's parental rights. At the hearing, Mother first reasserted her claim that the district court impermissibly placed R.O. with a foster family without obtaining the required testimony of an ICWA-qualified expert witness. She acknowledged Watashe's involvement but noted that Watashe did not join the case until after the first removal hearing, a delay which she alleged undermined any

4

contention that R.O.'s removal from the home complied with ICWA mandates given that the requirement for expert testimony exists to protect Indian families from improper separations.

The State countered that it was initially unaware of R.O.'s Indian status because Father claimed Cherokee membership without verification. It asserted that to the extent any error could be attributed to the order of the proceedings, it was properly considered harmless because an expert offered the required testimony at a hearing less than a week later. The district court rejected Mother's request to invalidate the removal, noting that the matter was previously raised and ruled on.

The evidence adduced during the termination proceedings established that R.O. remained with his foster family for roughly two years while multiple opportunities were made available for Mother to complete the reintegration plan, but that goal was never achieved. The precarious nature of Mother's mental health was a significant cause for concern in this case. KVC scheduled two separate mental health evaluations, to be completed at no cost to Mother, and she refused to participate. The district court later repeated the directive for Mother to obtain a psychological evaluation, but Mother again defied the order. Within that same category of tasks Mother was required to responsibly manage the medications prescribed for her mental illness, but neglected to ever produce documentation that demonstrated she was cooperating with her doctor to fulfill that obligation. Mother's sister, R.O.'s aunt (Aunt), testified that she developed apprehensions about Mother's mental health and erratic behavior in the 1990s and those same worries persisted. Aunt was particularly troubled by Mother's drug use and admission that she heard voices. She was of the opinion that Mother was out of touch with reality and lacked the stability required to care for herself, much less a young child.

Mother took the same approach with her mandatory drug tests and refused to submit a single sample during the entire reintegration phase of the case. In that same

vein, she declined to complete drug and alcohol counseling and likewise refused to attend the required parenting education courses. Mother's obligations to provide proof of stable housing with functioning utilities and verification that she received regular income that was sufficient to meet the needs of the family also went unanswered as she never established that those requirements were satisfied and no longer posed an impediment to reintegration.

Mother adopted a stance early on that she did not intend to perform any task required by the agency or the court aside from visiting R.O., and maintained that defiant disposition throughout the life of the case. She refused to attend monthly meetings with her KVC case manager as directed and rejected efforts to engage in a productive discussion with KVC about her reintegration plan. However, Mother freely communicated with KVC when it involved airing her dissatisfaction via group emails to her case manager, the district court, and other parties involved in the case.

Unfortunately, Mother's commitment to regular visitation with R.O. was on par with what she exhibited toward her other obligations. KVC facilitated visits between the parents and R.O. in mid-2022, but in September of that year the parents attempted to physically remove R.O. from the KVC office. As a result, the visits were transitioned to Zoom and Mother's visits became less frequent; sometimes she opted not to visit R.O. at all. By December 2022, both parents declined to participate in any further visits by Zoom; nevertheless, KVC ensured visitation with R.O. remained a possibility in the event the parents decided to resume participation.

Watashe testified and clarified that she had become involved in the case shortly after the State filed its CINC petition but acknowledged that the tribe did not receive notice 10 days before R.O. was removed from the home. She advised that at no time during her involvement with the matter did she witness any indications of cultural bias toward Native Americans generally, or the Cherokee tribe specifically. Watashe

6

acknowledged that the State established a reintegration plan, with concerted efforts to address Mother's mental health issues so that the homogeny of the Indian family might be preserved. However, given Mother's significant struggles with her mental health and her refusal to seek treatment for them, as well as her failure to complete the remainder of her reintegration plan, the tribe agreed that termination of Mother's parental rights was appropriate.

Watashe explained that ICWA prioritizes placing Indian children with extended family or, if that is not possible, other members of the same tribe, or any Native American tribe. She concurred that returning R.O. to Mother would result in serious emotional or physical damage to the child and verified that R.O.'s current placement was ICWA compliant because one foster parent was Cherokee.

Mother testified that KVC took R.O. in violation of Mother's civil rights and that KVC, DCF, and other involved agencies were largely dismissive of her rights. She asserted that she actually completed all the evaluations required by the reintegration plan and also satisfied her obligation to submit to random urinalyses. Mother explained that she was not homeless but had more than one place to stay that offered stable help with R.O. "because at this point, I'm not confident in being with my child by myself."

The guardian ad litem closed out the evidence and testified they shared the State's position that termination was in R.O.'s best interests. The district court then took the matter under advisement.

At a subsequent hearing to pronounce its ruling, the district court found that the evidence established beyond a reasonable doubt that both parents were unfit. In explaining its findings as they related to Mother specifically, the district court highlighted the following factors: (1) reasonable and active efforts by KVC and DCF failed to rehabilitate the family; (2) Mother made no effort to adjust her circumstances, conduct, or

conditions to meet the needs of R.O.; (3) Mother failed to maintain regular visitation, contact, and communication with R.O. and his custodian; (4) Mother failed to complete a single task of her reintegration plan; and (5) Mother suffered from emotional or mental illness of such significance as to render her unable to care for the physical, mental, and emotional health of R.O. The district court concluded that Mother's condition of unfitness was unlikely to change in the immediate or foreseeable future and R.O. would suffer serious emotional and physical harm if Mother's custody was restored. It noted that ICWA requirements were satisfied and R.O.'s best interests would be served by the termination of Mother's parental rights.

Mother appeals the termination of her rights, arguing that ICWA's notice requirements were violated and that the district court neglected to make the required best interests findings.

LEGAL ANALYSIS

I. *Did the district court fail to follow the notice procedures required by ICWA?*

Mother's first claim of error is that the district court failed to firmly adhere to ICWA's procedural requirements. The foundation for her contention is that the State's expert, Watashe, did not testify before R.O. was removed from the family home and placed in foster care. The State counters that prior notice to the tribe is not required under circumstances such as those presented here, where an emergency situation necessitates the Indian child's immediate removal from the home. It advances the alternative argument that any procedural error was harmless.

*Standard of Review*

Whether the State's late notice to the Cherokee Nation constituted a procedural deficiency raises a question of statutory interpretation or construction, i.e., a question of

8

law over which this court exercises unlimited review. *In re A.J.S.*, 288 Kan. 429, 431, 204 P.3d 543 (2009). To the extent the determination rests on questions of fact, we review the district court's findings for substantial competent evidence. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

Ordinarily, the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., governs proceedings to terminate parental rights. But in situations where the initiated case involves an Indian child, the proceedings are supplemented by the requirements set forth under ICWA. K.S.A. 2024 Supp. 38-2203(a); see *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010). If the district court knows or has reason to believe there is a possibility that the child at issue in a termination proceeding might be Indian, then it must order the party seeking to terminate the parent's rights to notify the child's tribe of the proceedings and of its right to intervene. ICWA demands that such notice be issued via certified mail, return receipt requested. Whether a child qualifies as an Indian for purposes of ICWA is ultimately a determination for the child's potential tribe, not the district court. *In re M.B.*, 39 Kan. App. 2d 31, Syl. ¶ 5, 176 P.3d 977 (2008). A failure to comply with these notice provisions affords the parent of the Indian child the opportunity to seek to have the proceedings invalidated. 25 U.S.C. §§ 1912(a), 1914; see 25 C.F.R. § 23.11(a) (2014); accord *In re H.D.*, 11 Kan. App. 2d 531, Syl. ¶¶ 2-6, 729 P.2d 1234 (1986). The district court is prohibited from commencing a foster care placement or termination hearing until at least 10 days after the tribe receives the requisite notice. 25 U.S.C. § 1912(a). These rigid procedures were formulated to ensure "stringent" criteria was satisfied before an Indian child was removed from their Indian culture. *In re H.A.M.*, 25 Kan. App. 2d 289, 294, 961 P.2d 716 (1998); Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,585-86 (November 26, 1979); see 25 U.S.C. § 1902.

ICWA does provide one exception to these foster placement rules. Under 25 U.S.C. § 1922, the State is not required to wait the 10 days prescribed in 25 U.S.C.

9

§ 1912(a) if emergency removal of the child is necessary to protect them from imminent physical damage or harm. Thus, federal law recognizes that "emergency removal and placements are sometimes required to protect an Indian child's safety and welfare." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38779 (June 14, 2016). Once the risk is neutralized, however, and the child is no longer in harm's way, the emergency removal option terminates immediately. The State must then "expeditiously" move to the next step in one of three ways: (1) initiate a child custody proceeding subject to the provisions of this subchapter, (2) transfer the child to the jurisdiction of the appropriate Indian tribe, or (3) restore the child to the parent or Indian custodian. 25 U.S.C. § 1922. The State may petition for a court order authorizing continued emergency physical custody, provided the request is accompanied by evidence demonstrating that the Indian child continues to be at risk of suffering imminent physical damage or harm if they are returned to the custody of their parent(s). Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146-02, at 10,155 B.8.(d) (February 25, 2015).

The State likewise bears a heavier burden of proof when seeking to remove an Indian child from the home, and ICWA outlines how foster care placement must be effectuated. The parties agree that ICWA rules for foster care placement applied at the time R.O. was removed from his parents' home. Once the notice requirement is satisfied and the matter proceeds to a hearing, the district court may not order the Indian child's placement in foster care until it first determines that clear and convincing evidence, which includes testimony from an ICWA qualified expert witness, demonstrates "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).

Here, the State's CINC petition included a notation that R.O. might be an Indian child given his Father's Cherokee heritage. Even so, the requisite notice was not issued and received by the tribe before the district court moved forward with a determination concerning foster placement for R.O. In support of its request for a foster care placement,

however, the State argued that "[a]n emergency exists necessitating out of home placement" due to concerns of substance abuse, unstable housing, and the parents' refusal to cooperate with MDSS, the rehabilitative agency charged with overseeing the case involving the family that was filed in Missouri. The district court in turn found that R.O. was likely to suffer harm if he was not immediately removed from his parents' custody and placed the child in the temporary custody of DCF.

Mother requested a rehearing asserting a deficiency in notice, and the district court granted her request by conducting a proceeding six days later. At this hearing, Watashe, a child welfare specialist well-versed in ICWA's requirements, was present and testified as a member of and representative for the Cherokee Nation. The result of the hearing was the same as the district court again concluded that the circumstances warranted R.O.'s immediate foster placement with DCF. It further noted that Watashe's testimony established that the district court's initial finding that an emergency existed which warranted R.O.'s prompt removal from the home, as well as its subsequent finding to the same effect following the rehearing, were sufficient to meet the demands required by ICWA for removing an Indian child from their parents' custody.

The record before us reflects a determination by the district court that urgent removal from the home was necessary to ensure R.O.'s physical safety, which complies substantively with 25 U.S.C. § 1922. Following the rehearing conducted at Mother's request, the district court clarified that when it determined there was clear and convincing evidence "that the child is likely to sustain imminent physical damage or harm pursuant to 25 C.F.R. [§] 23.113 and remaining in the home would be contrary to the welfare of the child," it was intended to communicate that an ICWA-defined emergency existed. The district court followed the standards in 25 C.F.R. § 23.113—the implementation regulation based on 25 U.S.C. § 1922—for emergency proceedings involving an Indian child. We decline to find any error occurred under the notice provision of 25 U.S.C. § 1912(a) because the removal proceeding was not covered by that provision. Instead, as

11

the district court correctly found, the foster placement hearing was an emergency proceeding under 25 U.S.C. § 1922.

II. *Did the district court enter a formal conclusion regarding R.O.'s best interests before terminating Mother's parental rights?*

A parent has a constitutionally protected liberty interest in their relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before a district court may terminate a person's parental rights, Kansas law requires a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that it is in the best interests of the child for the parent's right to be terminated. K.S.A. 38-2269(a), (g)(1).

Due to the fundamental nature of a parent's rights, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). Once a parent is determined to be unfit—both at the time of the hearing on the State's termination request and for the foreseeable future—the district court moves on to an assessment of what is in the best interests of the child. K.S.A. 38-2269(g)(1). In so doing, the court gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). Determining what is in a child's best interests is inherently a judgment call and, as such, that judgment is reviewed for an abuse of discretion. Reviewing courts will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. Hallmarks of such abuse include decisions with which no reasonable person would agree or those that are premised on factual or legal error. 50 Kan. App. 2d at 1116. Stated another way, a district court acts outside the scope of its broad discretion when it ignores controlling facts or relies on

unproven factual representations, acts outside the appropriate legal framework, or rules in a way no reasonable person would have under the circumstances. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

The district court found that the State established by clear and convincing evidence that Mother was unfit to parent R.O.—both at the time of the hearing and for the foreseeable future—based on K.S.A. 38-2269(b)(1) (Mother's untreated mental illness), (b)(7) (failure of agencies' efforts to rehabilitate the family), (b)(8) (lack of effort to adjust her circumstances), (c)(2) (lack of meaningful visitation or communication with the child), and (c)(3) (not completing the reintegration plan).

Mother does not contest the district court's unfitness findings, nor does she challenge its conclusion that her unfitness would likely continue for the foreseeable future, K.S.A. 38-2269(a), thus waiving any objection on either of these grounds. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (issues not briefed are deemed waived or abandoned).

Mother's primary claim under this issue is that the district court failed to consider R.O.'s physical, mental, or emotional needs in accordance with K.S.A. 38-2269(g)(1) before terminating Mother's parental rights. She contends that the "record on this subject is entirely void."

K.S.A. 38-2269(g) expressly requires the district court to consider whether termination of the parent's rights is in the child's best interests before severing those ties. Specifically, the statutory standard sets forth the following: "If the court makes a finding of unfitness, the court *shall* consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." (Emphasis added.) K.S.A. 38-2269(g). This court has previously held that subsection (g)(1)'s plain language requires reversal if the district court terminates a parent's rights without first analyzing

13

whether it is in the child's best interests to do so. See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

A fair reading of the record reveals that Mother's assertion is belied by explicit statements articulated by the district court when pronouncing its formal ruling on the State's termination request. The transcript of that proceeding reveals the district court specifically found:

"Considering the physical, mental, and emotional health of [R.O.], the Court finds that it is in the best interest of the minor child for the parental rights of [T.B.] and [J.O.] to be terminated. The physical, mental, and emotional needs of this child are best served by termination of parental rights."

The district court's ruling was memorialized in writing and that order reflects the following with respect to R.O.'s best interests:

"Considering the physical, mental or emotional health of each child, termination of parental rights is in the best interests of the child named above and the physical, mental or emotional needs of the child would best be served by termination of parental rights. The parental rights of [T.B.] and [J.O.] to the minor child [R.O.] should be and are hereby terminated."

The district court correctly and explicitly stated that R.O.'s physical, mental, and emotional health was best served by termination of parental rights. Thus, we are satisfied that the district court afforded R.O.'s best interests fair consideration. Given Mother's struggle with mental health issues and her unwillingness or inability to address the same, her refusal to participate in urinalysis testing to allay concerns of substance abuse, the absence of stable, habitable housing, her failure to maintain regular visitation with R.O., and refusal to complete any portion of the reintegration plan over a two-year period, the

14

district court reasonably concluded that it was in R.O.'s best interests to terminate Mother's parental rights.

Mother advances a secondary claim under this issue to allege that despite the fact Watashe emphasized the importance of preserving an Indian child's connection with their heritage, the district court neglected to ensure that bond remained intact when it allowed R.O.'s placement in a foster home that lacked any Native American influence. Mother's claim is again belied by the record before us. Watashe specifically testified during the termination proceedings that R.O.'s placement was ICWA compliant by virtue of the foster father's membership with the Cherokee Tribe.

Each of Mother's claims of error was carefully considered and analyzed but ultimately found to be without merit. We affirm the district court's termination of Mother's parental rights.

Affirmed.